# WESLEY HILL ET AL.

## vs.

## STATE OF MARYLAND.

*Prosecution for Rape—Indictment—Variance as to Time—*
*Evidence—Mental Capacity of Prosecutrix.*

A demurrer to an indictment cannot be sustained if there is
one good count.                                              p. 361

An indictment for assault with intent to commit rape *held*
good as against demurrer, it being practically in the form given
by various books of forms, although containing more than was
necessary.                                                  p. 361

The general rule is that unless time is of the essence of the
offense, it is sufficient if laid at any time before the finding of
the indictment and within the period of limitation prescribed
for that offense.                                           p. 361

That an indictment of four persons for assault with intent
to commit rape stated that the offense was committed on June
2nd, while the evidence was to the effect that it was committed
on April 2nd, *held* not prejudicial to the accused on the theory
that they might again be placed in jeopardy for the same
offense, this not being possible even in the case of one of them
with whom the prosecutrix had previously had intercourse, but
under entirely different circumstances.                     p. 362

Under an indictment in the usual common law form for
rape, one cannot be convicted under Code, art. 27, sec. 421, for
carnal knowledge of a woman who is imbecile, *non compos men-*
*tis*, or insane.                                           p. 366

Under an indictment for rape and assault with intent to
commit rape, as reflecting upon the character and extent of
the resistance by prosecutrix at the time, and her subsequent
conduct in riding home with two of her assailants and failing
to mention the assault to her parents or other person, a physi-
cian, who had known her all her life, could properly be asked

as to her physical and mental condition, and his answer to such question, to the effect that she was but partially developed mentally, was admissible. pp. 366-369

A signed statement by one of four persons jointly indicted for a crime, acknowledging the commission of the crime, is admissible against such one person, in the absence of a showing that it was not voluntarily and freely made. p. 369

On a trial for rape and assault with intent to commit rape, a remark by the State's Attorney, made after hearing the original statement of the prosecutrix, that he would not have any warrants issued unless her statement was corroborated, was inadmissible, it being his right thereafter to change his mind, and it not being material whether he had warrants issued, the traversers being tried on an indictment found by the grand jury, and being found guilty thereunder. pp. 369, 370

*Decided April 27th, 1923.*

Appeal from the Circuit Court for Dorchester County (BAILEY and DUER, JJ.).

Criminal proceeding against Wesley Hill, Frank Thomas, Milford Thomas, and James Lewis. From a judgment of conviction and sentence, said defendants appeal. Affirmed.

The indictment was as follows:
*State of Maryland, Dorchester County, to wit*:

The grand jurors of the State of Maryland, in and for the body of Dorchester County, upon their oaths do present that Wesley Hill, Frank Thomas, Milford Thomas, and James Lewis, late of the county and State aforesaid, laborers, on the second day of June, in the year of our Lord one thousand nine hundred and twenty-two, with force and arms, at the county aforesaid, in and upon one Elizabeth Seward, in the peace of God and the said State, then and there being,

violently, unlawfully and feloniously did make an assault, and her the said Elizabeth Seward then and there forcibly and against her will, feloniously did ravish and carnally know, contrary to the form of the Act of Assembly in such case made and provided, and against the peace, government and dignity of the State.

## SECOND COUNT.

And the grand jurors aforesaid, upon their oaths aforesaid, do further present that Wesley Hill, Frank Thomas, Milford Thomas, and James Lewis, late of the county aforesaid, laborers, on the second day of June, in the year of our Lord one thousand nine hundred and twenty-two, with force and arms, at the county aforesaid, in and upon one Elizabeth Seward did make an assault, and her the said Elizabeth Seward then and there did beat, wound and ill-treat, so that her life was greatly despaired of, with an intent her the said Elizabeth Seward against her will, then and there feloniously to ravish and carnally know, and other wrongs to her the said Elizabeth Seward then and there did, contrary to the form of the Act of Assembly, in such case made and provided, and against the peace, government and dignity of the State.

The cause was argued before BOYD, C. J., BRISCOE, THOMAS, PATTISON, URNER, and OFFUTT, JJ.

*W. Calvin Trice,* with whom were *Henry & Henry* on the brief, for the appellants.

*Alexander Armstrong, Attorney General,* with whom were *A. Stengle Marine, State's Attorney for Dorchester County,* and *Harrington, Harrington & Wallace,* on the brief, for the State.

Boyd, C. J., delivered the opinion of the Court.

The appellants were tried before the Circuit Court for Dorchester County without a jury, on an indictment containing two counts—the first charging rape and the second an assault with intent to commit rape. The accused were found not guilty on the first count but guilty on the second, and were sentenced to confinement in the Maryland Penitentiary for the period of three years. There was a general demurrer to the indictment which was overruled. Under our well established practice, such a demurrer could not be sustained, if there is one good count in the indictment, even if the other is defective. *Wheeler* v. *State,* 42 Md. 563; *Avirett* v. *State,* 76 Md. 510, 527.

The first count was in the form generally used for such an alleged crime in this State, and was undoubtedly valid. Nor do we find any defect in the second count which would have justified the court in sustaining a demurrer to it, if it had been specifically to that count or each count in the indictment. It practically is the same form as that given in *Archibold's Criminal Law* and other books of forms, and while it has more in it than was necessary, there is nothing in it which made it defective.

The theory of the first and second bills of exception is that there was a fatal variance as to time between the allegation in the indictment and the evidence, under the circumstances of this case. It must be conceded, however, that the general rule is that unless time is of the essence of the offense, "it is sufficient if it be laid at any time before the finding of the indictment and within the period of limitation which may be prescribed for that particular offense." 10 *Ency. Pl. and Pr.* 511; 22 *Cyc.* 313; 1*st Wh. Cr. Proc.* (10 ed.), sec. 162; *Capritz* v. *State,* 1 Md. 569, 574; 22 *R. C. L.* 1195—the latter referring to the statement of time in an indictment for rape. Section 496 of article 27 of 3rd volume of our Code also provides that no indictment for felony or misdemeanor shall be quashed nor shall any judgment upon an indictment

for felony or misdemeanor be stayed or reversed "for omitting to state the time at which the offense was committed in any case where time is not of the essence of the offense, nor for stating the time imperfectly, nor for stating the offense to have been committed on a day subsequent to the finding of the indictment, or making the presentment, or on an impossible day, or on a day that never happened, or by reason of any mere defect or imperfection in matters of form which shall not tend to the prejudice of the defendant," etc. That section shows the policy of this State in connection with such matters.

The indictment alleges the offense in this case to have been on the 2nd day of June, 1922, while the evidence of the State shows it was on Sunday April 2nd, 1922, but the learned attorneys for the accused contend that the variance was to their prejudice, as in the event of another indictment the traversers would not be protected from being again placed in jeopardy for the crime of which they were convicted, and as the prosecutrix spoke of another occasion in which some of the accused were involved, they were entitled to know definitely as to what they were to be tried for. But the witness did not testify to a similar crime by the four traversers. She did speak of having had sexual intercourse in 1921 with one of them, but not with the other three, and even as to that one the circumstances were entirely different from those in this case, and there could be no possible danger of his being again tried for the offense for which he has been convicted under this indictment.

There was some confusion in her testimony at first as to the time, but that she corrected and stated positively that the alleged crime with which the appellants were charged was on the first Sunday in April, 1922, afterwards giving the day and the month as the 2nd day of April. That was made sufficiently clear on her examination in chief, and after her cross-examination and re-examination, there remained no possible doubt in the record as to the time, and the charge of which the traversers were convicted. The question objected

to in the first bill of exceptions was not answered, but at the request of the attorneys for the traversers the evidence of the prosecuting witness was admitted subject to exceptions and after her examination in chief, her cross-examination and re-examination were completed, a motion was made "to strike out all of the testimony of the witness, Elizabeth Seward, said testimony having been admitted subject to objection." That motion was overruled and is presented by the second bill of exceptions.   In addition to the objection that the motion was too broad, even if the theory of the traversers as to time had been correct, we can have no doubt that the action of the court was correct in refusing to grant the motion.

The evidence shows that the prosecuting witness and her brother, Charlie, who was not then sixteen years of age, were on their way to church that Sunday evening.   They were walking and Frank Thomas, who was then walking, overtook them.   In reply to his inquiry, she told him they were going to church.   He walked along with them until a horse and buggy overtook them and the other three traversers were in the buggy.   The horse and buggy were stopped and someone in it said, "Won't you have a ride."   She replied, "No, I don't want to ride."   They drove on a little way and stopped again, asking her to take a ride, but she said she did not want to get in, and Frank Thomas said: 'Well, if you don't get in, I am not going to get in neither.'   Later he stopped and he begged me to get in the carriage, says Charlie wanted to get in."   Finally Charlie got on the back of the buggy and she and Frank Thomas got in, and he sat on her lap.   She and the four traversers were then in the buggy.   She said that Frank Thomas and someone in the buggy promised before she got in that they would take her directly to the church. They drove on and when they reached the church drove faster, but her brother got off.   She said, "I commenced crying and he hurt my feelings and I tried to persuade him to put me out and he said, 'No, you are in here now and you are going to stay in here.'"   She later said that James Lewis made

that remark. She testified that she was trying to get them to let her out of the buggy but they would not do so until they had driven to what they said was a place called Bar Neck, but she had never been there before; that they drove into a piece of woods, where she again asked them to let her get out, but they said, "Wait awhile and we will all get out." All got out, one of them tied the horse to a tree, and one of them kept hold of her. They took the blankets out of the carriage and laid them and their overcoats on the ground. According to her testimony they laid her down on the blankets, held her and prevented her from getting away. We will not state all of the details, but it is sufficient to say that she testified that each of the four either had or tried to have sexual intercourse with her, forcibly and against her will. She said that she was resisting as well as she could and she could not tell whether any of them accomplished their purpose, but later stated Hill did not.

After they left the woods she drove back with two of the traversers towards her father's house, getting out of the buggy before reaching her home, and said that she went back with them because she was so sore and felt so badly she could not walk home and was afraid to stay out in the woods by herself. Her mother was dead, but when she got home she saw her stepmother, who questioned her as to where she had been, but she did not tell her or her father, or anyone that night what had occurred, and it was some time before she told anyone. The prosecution was apparently not begun until about August 1st. She said she told her stepmother some things that night, but did not give the names of the traversers or say just what they had done to her, and she was afraid to tell her father for fear he would shoot them and get into trouble. She admitted that she had had intercourse with one of the accused the year before and that another of them had sought to have intercourse with her but she refused. We speak of these matters, not as reflecting upon the verdict found by the court, as that was for the judges, sitting as a

jury, to determine, and if they believed the testimony of the prosecuting witness which they had the opportunity to judge of, not only from what appears in the record, but from what they saw of her at the trial, there was ample to justify a conviction, notwithstanding what we have said above, and what we have stated reflects upon the question which we are now about to consider.

It is manifest from her evidence that she was not a very strong minded person, and did not altogether appreciate the extent of the great wrong that was done her by the traversers, although she could not well be classed as "an imbecile, *non compos mentis,* or insane," within the meaning of section 421 of article 27 of our Code, but even if she could have been, it was not so charged in the indictment. That section is as follows:

> "If any person shall carnally know and abuse any woman child under the age of fourteen years, or knowingly carnally know and abuse any woman who is an imbecile, *non compos mentis* or insane, of any age whatever, every such carnal knowledge shall be deemed felony, and the offender being convicted thereof, shall, at the discretion of the court, suffer death or imprisonment for life in the penitentiary, or for a definite period, not less than eighteen months nor more than twenty-one years."

This brings us to the third, fourth and fifth bills of exceptions. Doctor Stokes testified that he had known Elizabeth Seward since her birth—having attended her mother at that time, and was then asked: "Will you please state to the court the physical and mental condition of this prosecutrix?" That was objected to, and the objection having been overruled, the ruling was presented by the third bill of exceptions. He then answered: "I should describe her as a moron. That is the grade of intelligence when it is all right up to a certain stage of development. After that, development ceases. It never attains the highest standard. That is about all I can

say about it. That is what I call her condition." The answer was objected to, the objection was overruled, and that ruling is presented by the fourth bill of exceptions. The fifth bill of exceptions was to the refusal of the court to strike out that answer.

The definition of the term "moron" used by the Doctor, is given in the Standard Dictionary as "a feeble minded person, of higher intelligence than an imbecile." The defendants were not indicted under section 421 of article 27, and hence could not have been convicted under that section on the indictment in this case, which is the usual common law form for rape. The evidence of the prosecuting witness, who was not quite twenty-one years of age at the time of this occurrence, was that the acts complained of were forcibly and violently done, and without her consent. She went into considerable detail as to her resistance and how she endeavored to protect herself against the accomplishment of the act. While it would have been difficult, if not impossible, to have convicted the defendants, or either of them, under section 421, if they had been indicted under it, her testimony showed that she did not give her consent, and that the assault on her was with an intent to ravish and carnally know her. As reflecting upon the character and extent of her resistance, and her subsequent conduct in not telling her stepmother, father or other person at once, in riding home or part of the way with two of her assailants, the evidence given by the doctor was admissible. As we have indicated, some things she did, or did not do, might have been done or omitted, without being evidence of consent, by a person of such mentality as the prosecuting witness is described to be by Doctor Stokes, which would not have been done or omitted by a woman of a higher standard. In the judgment of a virtuous woman of intelligence, there is nothing which calls for more resistance by her than protection against such an assault upon her. Some women who cannot fairly be said to be lewd or unchaste may not have the same exalted idea of virtue, or how far they can and should go in

defense of it, as those who are more refined, more intelligent, more cultured and probably better taught as to such matters. A timid woman may not resist such an attack as far as a fearless woman would. In short, it cannot be said that all women would use the same amount of resistance, or that every woman would act in the same way at all times, under such circumstances as described by the prosecuting witness. It is said in 33 *Cyc.* 1470 that "evidence of the physical and mental condition of the prosecutrix at the time immediately prior to the offense is admissible as bearing on the question of consent and her ability to resist. Proof may be made of want of physical and mental development, whether she was over or under the age of consent. Her schooling and mental ability may be shown. And, of course, competent evidence is admissible to show that the prosecutrix was insane, or imbecile, and therefore incapable of consenting."

It is said in 22 *R. C. L.* 1183, sec. 15. "Whether intercourse with a non-resisting or consenting idiotic or insane woman is rape depends upon her capacity to understand the nature of the act, and upon the possession by her of a will power with which either to consent or refuse. * * * The mere fact that a female is weak minded does not, however, disable her from consenting to an act of sexual intercourse, and thereby preventing the act from being rape, for the victim may be capable of consent, as, where the idiocy is not very profound or the mania severe. * * * The mental capacity of the female to give her consent to the act for which the defendant is prosecuted is a question of fact for the jury to determine along with all the other questions of fact submitted to them by the evidence." Again, on page 1203, sec. 38 of that volume, it is said that "Upon the question whether the female's mind was such as to render her incapable of consenting to the act of intercourse and whether her mental infirmity was of long standing, evidence of the past, present and future condition of her mind has been held admissible as bearing upon her state of mind at the time of the occurrence."

In a note beginning on page 1049 of *Ann. Cas.* 1912 B under the case of *State* v. *Warren,* 232 Mo. 185, on page 1043 of that volume of *Annotated Cases,* there is quite a full discussion of the subject of "Intercourse with Woman of Unsound Mind as Rape." It begins by saying that "It is unquestionably true that the crime of rape may be committed upon a woman who is insane, idiotic, or an imbecile." It then refers to the fact that a number of statutes have been passed on the subject and says: "Under such statutes it has been held that a capacity to give a legal consent to the act of intercourse presupposes an intelligence capable of understanding the act, its nature, and possible consequences." Later, it is there said: "The mere fact that a female is weak minded does not disable or disbar her from consenting to an act of sexual intercourse, and thereby prevent the act from being rape * * *. However, the mental condition of the female is to be considered as bearing upon the question whether the act was against her will and consent, and the extent of the resistance which the law required her to make. *State* v. *Tarr,* 28 Ia. 397; *People* v. *Marrs,* 125 Mich. 376; 84 N. W. 284; *Thompson* v. *State,* 44 Neb. 366, 62 N. W. 1060. Though the indictment charges rape generally and is not framed under a statute punishing persons who have sexual intercourse with females of unsound mind, evidence that the female was of unsound mind has been held admissible as bearing on the question of consent. *State* v. *McDonough,* 104 Ia. 6, 73 N. W. 357; *Segrest* v. *State* (Tex.), 57 S. W. 845. See also *State* v. *Atherton,* 50 Ia. 189, 32 Am. Rep. 134."

It will, of course, be observed that the authorities cited above for the most part refer to cases where the question was whether the woman was of such unsound mind as to make other proof of the want of consent unnecessary, and it will be remembered that in this case the State relied on the allegation and evidence that the acts of intercourse were against the will and without the consent of the prosecutrix, but the authorities cited are applicable as reflecting upon what we

have referred to above—that is to say, that although a prose-cutrix may not be, and in this case may be conceded not to be, such a person as section 421 of article 27 refers to, her mental condition may be shown for the purpose of explaining why she did not resist as actively, or did not complain as promptly as might be required of one of a more active mind. As Doctor Stokes, the physician in this case, knew her from her birth, his evidence reflecting upon the past, present and future condition of her mind was as applicable as on the theory advanced in 22 *R. C. L.* 1183 and also in the note on p. 1053 in *Ann. Cas.* 1912 B. In our opinion the evidence was not only admissible, but it was useful in clearing up some portions of the evidence of the prosecutrix which might other-wise have been difficult to understand.

We do not quite understand the ground of objection to the introduction of the statement made by Wesley Hill presented by the 6th exception. What we have said above as to the variance between the time alleged in the indictment and that in the testimony is sufficient to show what we think of the question of variance in reference to this statement. It was only admitted as applicable to the defendant Hill, and was so understood, as shown by the record. The details set out in it show conclusively that it referred to the same occurrence as that testified to by the prosecutrix and relied on by the State, and not to any other occasion. There can be no doubt about its admissibility in the absence of contradiction that it was voluntarily and freely made, as the testimony of the State's Attorney shows.

The 7th exception was likewise without any sufficient ground to base a reversal on. The question objected to by the State and ruled out by the court was asked on cross-examina-tion of the State's Attorney, who was called in connection with the statement of Hill, referred to above. It was: "Didn't you tell Dr. Hubbard and the detective, after hear-ing her statement, that you would not have any warrants issued unless her statement was corroborated by somebody?"

That was not admissible, if he said it. It was not only his right, but his duty to change his mind, if upon further reflection or inquiry he concluded he was wrong, if he made such a statement, but, independent of that, it was not material whether or not he did have warrants issued. The traversers were tried on an indictment found by the grand jury, and they were found guilty on the second count by the court sitting as a jury. Even if the State's Attorney was of the opinion that they were not guilty, the result showed that he was mistaken in the judgment of those whom the traversers elected to try their case. It follows that the judgment must be affirmed.

> *Judgment affirmed, the appellants to pay the costs.*