10 A.3d 782

**STATE of Maryland**

v.

**Jason MAYERS.**

**No. 30, Sept. Term, 2010.**

Court of Appeals of Maryland.

Dec. 22, 2010.

Cathleen C. Brockmeyer, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, Baltimore, MD), on brief, for petitioner.

David P. Kennedy, Asst. Public Defender (Paul B. DeWolfe, Public Defender, Baltimore, MD), on brief, for respondent.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS and BARBERA, JJ.

BATTAGLIA, J.

Jason Mayers, Respondent, was convicted by a jury in the Circuit Court for Somerset County of second degree sexual offense, second degree assault, and fourth degree sexual offense, involving an encounter with S.C., an eighteen-year-old sophomore at the University of Maryland—Eastern Shore (UMES), in which Mayers fondled S.C.'s breast and vagina and also performed oral sex or cunnilingus on S.C. against her will. On appeal, a divided panel of the Court of Special Appeals reversed Mayers's conviction for the second degree sexual offense,[1] determining that there was insufficient evidence of "force or the threat of force," under Section 3–306(a) of the Criminal Law Article,[2] to sustain a conviction. We

---

**1.** The Court of Special Appeals affirmed Mayers's second degree assault and fourth degree sexual offense convictions. Neither of those convictions is challenged before us.

**2.** Section 3–306 of the Criminal Law Article, Maryland Code (2002), defines "sexual offense in the second degree" as follows:

(a) *Prohibited.*—A person may not engage in a sexual act with another:

granted certiorari, *State v. Myers*, 414 Md. 330, 995 A.2d 296 (2010), to answer the following question, which we have re-phrased for clarity:

Was there sufficient evidence to sustain Mayers's conviction for second degree sexual offense?

We shall hold that there was sufficient evidence presented of "force or the threat of force," from which a rational jury could conclude beyond a reasonable doubt that Mayers committed a second degree sexual offense when he performed cunnilingus on S.C. against her will.

Mayers was charged in a five count criminal information with offenses committed against S.C. in November of 2003, although only the fourth count, dealing with the second degree sexual offense related to the act of cunnilingus, is in issue in this appeal. At a one day trial, S.C., the prosecutrix, described that she was a student living in a residence hall suite at UMES during the Fall of 2003, along with five other female suite mates. She recounted that on Friday, November 14, 2003, her roommate (Roommate 1) informed S.C. that her boyfriend was visiting the campus with a male friend for the weekend. Roommate 1 did not disclose that Mayers was the male friend; S.C. and Mayers had engaged in consensual sexual intercourse on one occasion several months earlier, but had not been in touch since then.

S.C. testified that on the night of November 14, she had a headache and decided to stay home and rest in the lower berth of the bunk bed she shared with Roommate 1, rather than join her friends at a campus party. At about 6:45 a.m. the next morning, Mayers came to the suite, knocked on the door, and was admitted by one of S.C.'s other roommates, who permitted Mayers to go·to S.C.'s bedroom to find his male friend. S.C. related the events that ensued:

---

(1) by force, or the threat of force, without the consent of the other;....

All references to Section 3–306 throughout are to the Criminal Law Article, Maryland Code (2002), unless otherwise noted.

[State's Attorney]: Did you hear [Mayers] come into your room that night—that morning?

[S.C.]: That morning as I was facing the wall I did hear someone come up the steps and come in the room, but I did not acknowledge or look to see who it was at the time.

[State's Attorney]: Did you have any idea who was already in the room?

[S.C.]: No, I did not. I knew [Roommate 1] was in the room, but I did not know that [her Boyfriend] was in the room because I was asleep.

[State's Attorney]: So you didn't hear [her Boyfriend] come in either?

[S.C.]: No. I really thought at the time it was [her Boyfriend] coming up the steps and coming in the room because he knew—he knew [Roommate 1] so of course he would come in the room.

[State's Attorney]: Okay. Did you determine who had just come in the room?

[S.C.]: I determined who came in the room when [Mayers] had tugged my shoulder and basically made me force [sic] the way that he was looking. And I looked at him and I shook my head no. And I turned back and faced the wall.

S.C. further testified that Mayers smelled of alcohol and marijuana, and despite her protestations, he began fondling her breast and vagina and then climbed on top of her and performed cunnilingus:

[State's Attorney]: You said you heard someone come in the room?

[S.C.]: Uh, huh.

[State's Attorney]: And then pull on your shoulder?

[S.C.]: Right, [Mayers] pulled on my shoulder. And the way the bed is laid out is that if I'm facing directly towards the wall, all the way going towards the wall there is a little bit of space left. He came in. He tugged on my shoulder. And once he tugged on my shoulder and I recognized him I told him, no. He climbed in my bed. He took off his

shoes—it was boots because they were very heavy and he tugged on my shoulder again. And I looked at him and I said, no.

And during the time I did smell alcohol on his breath as well as he was smoking. It smelled like marijuana at the time. He approached me and he told me what is wrong with you. And I told him I have a headache and I'm not feeling well and I'm extremely tired. He proceeded to say, well, I have something to make that feel better. When he said that he put his hand underneath my shirt and squeezed my left breast. I pushed his hand and I pulled my shirt down and I told him, no. Now, this is the third time me saying no.

He looked at me and I turned back to my wall. And he looked at me again and he said like he had like a look like what is wrong with you again. And I said once again I have a headache and I don't feel good. And right then and there he pulled me again and got on top of me and he pulled down my shorts and he performed oral sex on me. And by that time I had went [sic] into a state of shock. I went completely numb, excuse me, because of the fact that I realized I was getting sexually assaulted and that I had said no about five times during this time frame. And of course I went into a state of shock and I froze and I did not say anything at all.

And once he finished his oral sex he had sexual intercourse with me. He did not have a condom on at the time. And after he finished doing what he did he ejaculated on my sheets. And he went over on his side and he went to sleep.

S.C. recounted that she said "no" over and over again, to no avail, and pushed Mayers's hands away when he began fondling her breast and vagina:

[State's Attorney]: During this you said that you said no?

[S.C.]: Right.

[State's Attorney]: How many times?

[S.C.]: The last time it was the fifth time that I said no.

[State's Attorney]: Did you push him?

[S.C.]: I had pushed his hand when he was squeezing my left breast. And I had pushed his hands when his hands was [sic] going into my vagina, yes. And after that the whole thing basically like I said I went into a state of shock and I did not say anything. I didn't move at all.

[State's Attorney]: You said he performed oral sex?

[S.C.]: Yes, he performed oral sex on me.

[State's Attorney]: And you also had vaginal—

[S.C.]: And he had sexual intercourse, yes.

S.C. testified that she did not scream, because she "froze" and was "horrifically scared" that Mayers would force her to perform oral sex or fellatio on him and was also terrified by the prospect of contracting a sexually transmitted disease:

[State's Attorney]: Okay. You said you didn't scream?

[S.C.]: No, I did not.

[State's Attorney]: Okay. Why not?

[S.C.]: You know, I did not scream because like I said I was horrifically scared. Though I had [Roommate 1] there I did not scream because I was scared. I was horrified. I was really scared. And like this—nothing like this had ever happened to me. So for this to happen and for me to say, no, over and over and over and over again it was the point as if like I froze.

  \*   \*   \*

[State's Attorney]: Why were you scared?

[S.C.]: I was scared because like I said nothing like this had ever happened to me. I didn't know what else was going to happen after the fact. I didn't know what he might of [sic] had as far as STD or anything of that nature. Plus, you know, I just froze and I didn't say nothing [sic] at all. I didn't say nothing [sic] at all until he got finished doing what he had did [sic] to me and I went across the hall and I brought in my roommate and my suite mates.

[State's Attorney]: What were you scared he was going to do?

[S.C.]: I was scared that he was going to continue to rape me but be more—he was going to do more than what he had performed doing [sic] to me, rather he was going to have me perform on him.

[The Bench]: He was going to do what?

[S.C.]: He was going to have me perform on him.

S.C. testified that after Mayers "was done," she pulled up her panties and shorts, climbed over Mayers who had fallen asleep, and went across the hall to another suite mate's room, (Roommate 2):

[State's Attorney]: Now, you said that you went to your—what did [Mayers] do when he was done?

[S.C.]: Once he was done he rolled over and went to sleep in my bed. I must have laid there. I was crying. And I decided to get up out of my bed and inform my suite mates of what just happened.

I pulled up my panties and I pulled up my shorts, climbed over top of him and went across the hall to my suite mate [Roommate 2]. I knocked on the door and I stood there and I—I was crying very loud and I was shaking, you know, very, very like shaking.

And she asked me what was wrong. And I told her I had a lot of broken up sentences so basically all my words was [sic] just didn't make sense at the time but I was trying to explain to her what was going on. And I told her that boy, that boy, that boy across the room just sexually assaulted me. And she said, who. And I said Jason Mayers.... [My other suite mates] came upstairs to my room where I resided and told [Mayers] to get dressed and get out.

He lay there and he had a look of shock like why, why do I have to leave, what just happened. And then they went ahead and told him to leave now, get dressed and get out.

And mind you I'm in a room across but I could hear everything. So he got up and [Roommate 1's Boyfriend] told him to go downstairs into the car. And once that happened he went downstairs and he said, you looked at me as if you wanted it. He looked at me he said that to me.

Another roommate (Roommate 3), who occupied the bedroom on the first floor of the suite, also testified about Mayers's arrival at the suite in the morning:

[State's Attorney]: I'm going to ask you to think about Saturday November 15th, 2003 around 7:00 a.m. Were you home at that time?

[Roommate 3]: Yes.

[State's Attorney]: Who else was in the suite; do you know?

[Roommate 3]: In the whole house everybody was home except for one roommate. . . .

[State's Attorney]: Okay. Do you know whether [Roommate 1's Boyfriend] was present?

[Roommate 3]: I didn't know whether he was there or not.

[State's Attorney]: Now, did someone knock at your suite door at that time?

[Roommate 3]: Yes.

[State's Attorney]: Did you answer the door?

[Roommate 3]: Yes.

[State's Attorney]: Who was there?

[Roommate 3]: [Mayers].

[State's Attorney]: About what time was this?

[Roommate 3]: It was probably around I'd say quarter to seven, 6:30, quarter to seven.

[State's Attorney]: In the morning?

[Roommate 3]: Uh, huh.

[State's Attorney]: Did you have any conversation with [Mayers]?

[Roommate 3]: Yes.

[State's Attorney]: What was that conversation?

[Roommate 3]: He came to the door and asked was [Roommate 1's Boyfriend] there. And I told him that I wasn't sure whether he was there or not. And he said that he knew that he was there and could he go to the door and get him. So since I knew he had been there before I let him go up and knock on the door.

[State's Attorney]: What did you do?

[Roommate 3]: After I heard him knock on the door I went back to my room and went back to bed.

[State's Attorney]: Okay. [Mayers] went upstairs; is that correct?

[Roommate 3]: Yes.

[State's Attorney]: What's the next thing that happened?

[Roommate 3]: I think it was probably like maybe a half hour later [Roommate 2] came downstairs and she was banging on the door and she was yelling for [another roommate] to please come upstairs, hurry up and come upstairs. And we didn't know what was wrong. [ ] I followed her up there to see what was going on. And [S.C.] was in [Roommate 2's] room just crying and crying like somebody had died. . . .

[Roommate 3]: So that's when we asked him to leave.

[The Bench]: Him being?

[Ms. Pinkney]: [Mayers].

Roommate 3 described S.C. as "really upset" and like no one she had ever seen, after the incident:

[State's Attorney]: What did [S.C.] look like? What was her behavior?

[Roommate 3]: She was like she was crying, she was shaking. Like I've never seen anybody look like that before. She was really upset.

\* \* \*

[State's Attorney]: Okay. After [Mayers] left the apartment what did you do?

[Roommate 3]: We called 911 and had the police come over.

[State's Attorney]: Did [S.C.] go to the hospital?

[Roommate 3]: Yes.

[State's Attorney]: Okay. Did you go with her?

[Roommate 3]: Yes, we all went.

[State's Attorney]: Okay. How did [S.C.] act differently after that?

[Roommate 3]: Well, she's always been a shy person but she was more quiet. She didn't talk to anybody. She never wanted to do anything anymore. And it was like a piece of her died, like she was never the same.

Another roommate, (Roommate 4), described S.C. as "hysterical" after the attack:

[State's Attorney]: Now, I'm going to ask you to think back to November 15 of 2003, just prior to 7:00 a.m. Did you hear a knock at the door?

[Roommate 4]: I didn't hear a knock. I was asleep.

[State's Attorney]: When did you first become aware that something was going on?

[Roommate 4]: About 7:20, 7:30 in the morning. [Roommate 2] came into my room and was hysteric. She said you need to hurry up and come [S.C.] needs you. So I ran upstairs to check on [S.C.].

[State's Attorney]: Where was [S.C.]?

[Roommate 4]: In [Roommate 2's] room. I looked in her room first, but she wasn't in there.

[State's Attorney]: Who was in her room? You said you looked in there.

[Roommate 4]: [Mayers] was laying in her bed.

[State's Attorney]: Was [Roommate 1] in her bed, her own bed?

[Roommate 4]: Yes, and so was [Roommate 1's Boyfriend].

[State's Attorney]: When you went and saw [S.C.] in [Roommate 2's] room what was [S.C.] doing?

[Roommate 4]: [S.C.] was crying. She was hysterical, crying. And that's when I asked her what's wrong because everyone knows that I'm the person who takes care of people. So I asked what is wrong and she proceeded to tell me he raped me. So before I asked her like how did it happen I went to him and cussed him out. I was just hysterical because shocked [sic] that that was my friend you did that to. And I just wanted him out.

[State's Attorney]: When you say him you mean [Mayers]?

[Roommate 4]: Yes.

[State's Attorney]: Did [Mayers] say anything to you?

[Roommate 4]: He asked why do I have to get out. I said because you raped my friend, you raped [S.C.]. And he says how did I rape her she looked like she wanted it. And I said that's it. Pardon my language my exact words were get the fuck out.

[State's Attorney]: Did he get out?

[Roommate 4]: He slowly put his clothes on and walked nonchalantly down the steps while my friend is in the other room crying her heart out because she told him that she don't [sic] want to have sex with him. She had a headache that night. And he said I have something to make it feel better. If she's saying over and over no I think no means no.

[State's Attorney]: What happened once [Mayers] left the suite?

[Roommate 4]: I told [S.C.] we have to take you to the hospital because I want to make sure nothing is wrong with you. He didn't use a condom and I wanted to make sure that he didn't have any STD's or he didn't get you pregnant. So I wanted to make sure that you're all right.

[State's Attorney]: Okay. So you went to the hospital with her?

[Roommate 4]: Yes.

[State's Attorney]: And she was examined at the hospital?

[Roommate 4]: Yes.

[State's Attorney]: Do you remember how long she was there?

[Roommate 4]: We were there about I know more than three, four hours.

Roommate 4 described how S.C.'s encounter had changed S.C.:

[State's Attorney]: Did you notice any changes in [S.C.] after that incident?

[Roommate 4]: Yes. She became very depressed, withdrawn from us. One day I checked up on her, it had to be a couple days or a week after, she was slumped over her books and I got scared. I tried to pick her up and she was unresponsive. She tried to kill herself. . . .

[State's Attorney]: You said this was a few days after the assault?

[Roommate 4]: Uh, huh.

[State's Attorney]: How else was [S.C.] different?

[Roommate 4]: [S.C.] never wanted to go with us anymore. She always stayed in her room. I was—just didn't know [S.C.] anymore. She changed.

Roommate 1 also offered testimony about S.C.'s encounter with Mayers:

[State's Attorney]: Now, [your Boyfriend] had visited you on November 14th and 15th; is that correct?

[Roommate 1]: Correct.

[State's Attorney]: Okay. And did [your Boyfriend] have a friend with him that weekend?

[Roommate 1]: Yes, he did.

[State's Attorney]: Who was that?

[Roommate 1]: [Mayers].

[State's Attorney]: Did you know [Mayers]?

[Roommate 1]: I believe I met him previously at another time, but after that, you know, that was the second time that I saw him.

[State's Attorney]: Okay. Now, the night of November 14th of 2003, you slept in [your] room; is that right?

[Roommate 1]: [My Boyfriend] you're saying?

[State's Attorney]: You slept in your bed?

[Roommate 1]: Yes, I did.

[State's Attorney]: Okay. And [your Boyfriend] was there as well?

[Roommate 1]: Correct.

[State's Attorney]: Now, you and [S.C.] had bunk beds; right?

[Roommate 1]: Correct.

[State's Attorney]: And which bunk were you?

[Roommate 1]: I was on the top.

[State's Attorney]: Okay. Now, was [S.C.] in bed on the night of the 14th until the morning of the 15th of November?

[Roommate 1]: Correct. We were—we had to go to a party the night before. She had a headache so she stayed home. And, yes, she was there from that night until the next morning.

Roommate 1 described herself as a "heavy sleeper" and testified that she did not "hear anything happen" between Mayers and S.C.:

[State's Attorney]: Okay. So when you came home she was in bed?

[Roommate 1]: Correct.

[State's Attorney]: Did you hear anybody come in the morning of the 15th?

[Roommate 1]: No, I did not. I didn't wake up until [Roommate 2 and Roommate 4] came in yelling telling [Mayers] to leave.

[State's Attorney]: So you didn't hear [Mayers] come into the room?

[Roommate 1]: No, I did not.

[State's Attorney]: Did you hear anything happen between [Mayers] and [S.C.]?

[Roommate 1]: No, I did not.

[State's Attorney]: What kind of sleeper are you?

[Roommate 1]: I'm a heavy sleeper. I have a throat condition that—well, I breathe very, very heavily my breathing pattern so I sleep very heavy. And usually I

don't hear anything unless like somebody literally shakes me.

*     *     *

[State's Attorney]: Okay. And when you woke up where was [S.C.]?

[Roommate 1]: [S.C.] was in [Roommate 2's] room [across the hall] crying on the bottom bunk . . . looking through the doorway.

Roommate 1 described S.C. as "distraught" after the incident with Mayers:

[State's Attorney]: How would you say she was behaving?

[Roommate 1]: She was terrified, crying, upset, you know, she was just in distraught [sic].

[State's Attorney]: Did she say anything that you heard?

[Roommate 1]: Just the fact that she said, well, he forced himself on me. I said, no. And to that extent, but I can't remember the complete words that she had mentioned.

[State's Attorney]: How did [Mayers] react?

[Roommate 1]: I thought she wanted it. When—as soon as they came into the room I told [my Boyfriend] to tell him he had to go, get up, get your stuff and leave. He immediately left. . . . He went downstairs and he went to go sit in [my Boyfriend's] car because I believe [my Boyfriend] drove that night. He sat in the car. [My Boyfriend] stayed in the room tried to calm [S.C.] down. We as a group collectively said that we were going to go to the hospital with [S.C.] to the emergency room.

[State's Attorney]: Okay. Where did [your Boyfriend] go?

[Roommate 1]: [My Boyfriend] after—I can't remember, but I know he left out [sic] with us, but I believe he went to the car and we went to the hospital ourselves in [Roommate 4's] car. [Roommate 4] drove.

[State's Attorney]: And you took [S.C.]?

[Roommate 1]: Yes.

Roommate 1 further testified that S.C. attempted to commit suicide after the incident:

[State's Attorney]: Okay. Was [S.C.] different after that?

[Roommate 1]: Yes. After that that whole semester—that was a whole big deal for her. The next day she tried to—attempted to overdose on pills so she was not at a healthy state. We immediately took her to the hospital then as well. She was just—we had an ambulance come pick her up. All the rest of the semester she had a tough time.

[State's Attorney]: How was her behavior different?

\* \* \*

[Roommate 1]: Well, she wasn't herself after that. So that's something you just can't get over, overnight. So to me she was a different person. Even that next semester we came back she just—and I don't think until this day she wasn't really the same person. Like usually we would joke around but it's like that little barrier in between. So I don't think the fact that she never did have closure I don't think she's the same person as she was before then.

Mayers testified that S.C. "seemed a little distant" when he first came in her room and sat on her bottom bunk bed, but, after he apologized for not calling, they began kissing and engaged in consensual sex:

[Mayers]: At that time I kissed her, she kissed me back. Then I proceeded to perform oral sex on her. It was nothing about—there was no stop, no nothing like that. It was nothing like that.

Mayers moved for judgment of acquittal at the close of the State's case,[3] arguing that "force or the threat of force" under Section 3–306(a), which defines a second degree sexual of-

---

**3.** A Motion for Judgment of Acquittal is governed by Rule 4–324(a):

(a) **Generally.** A defendant may move for judgment of acquittal on one or more counts, or on one or more degrees of an offense which by law is divided into degrees, at the close of the evidence offered by the State and, in a jury trial, at the close of all the evidence. The defendant shall state with particularity all reasons why the motion should be granted. No objection to the motion for judgment of acquittal shall be necessary. A defendant does not waive the right to make the motion by introducing evidence during the presentation of the State's case.

fense, had not been proven. Specifically, Mayers asserted that there was no evidence of verbal threats or that S.C. had sustained any physical injury. Judge Daniel M. Long denied the Motion.

After less than a half hour of deliberation, the jury found Mayers guilty of second degree assault, second degree sex offense, and fourth degree sex offense. Thereafter, Mayers filed a "Motion to Set Aside Jury Verdict," arguing that the second degree sexual offense conviction was in error, because "[t]he facts of the case provided the jury with no evidence that force or the threat of force was used by [Mayers]" in order to perform oral sex on S.C. Judge Long again denied the Motion and sentenced Mayers to ten years' imprisonment, with all but four years suspended, followed by eighteen months of probation.

On appeal, when faced with the sufficiency of the evidence of Mayers's use of "force or the threat of force" in order to perform cunnilingus, a majority of the panel of the Court of Special Appeals determined that there was insufficient evidence that Mayers employed force, either actual force or the threat of force. The dissent, authored by Judge Deborah S. Eyler, opined that a rational jury could conclude that Mayers applied force to overcome S.C.'s resistance, because S.C. said "no" over and over again, and attempted to push Mayers's hands away when he tried to touch her breast and when he tried to penetrate her digitally, and also reasoned, regarding threats of force, that whether S.C.'s fear that Mayers would force her to perform fellatio was reasonable, was a jury question.

The State before us argues that a reasonable jury could certainly conclude that Mayers employed force or the threat of force to perpetrate the act of cunnilingus, because S.C. had repeatedly said "no" and had pushed Mayers's hands away multiple times, and also testified that she was "horrifically scared" that Mayers would "continue to rape her," that she would contract a sexually transmitted disease, and that he would force her to perform fellatio on him. Mayers counters

that there was insufficient evidence that he applied force or threats of force to accomplish the act of cunnilingus, because there was no evidence that S.C. sustained any physical injury or that Mayers threatened serious bodily harm.

In this case, as in any other, any discussion of evidentiary sufficiency must be placed in the context of the standard of review. We examine the record solely to determine whether "any rational trier of fact could have found the essential elements of the crime[ ] beyond a reasonable doubt." *Moye v. State*, 369 Md. 2, 12, 796 A.2d 821, 827 (2002); *accord Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1979) ("[T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction ... is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."); *see Hackley v. State*, 389 Md. 387, 389, 885 A.2d 816, 817 (2005). In so doing, "[i]t is not our role to retry the case." *Smith v. State*, 415 Md. 174, 185, 999 A.2d 986, 992 (2010). Rather, "[b]ecause the fact-finder possesses the unique opportunity to view the evidence and to observe first-hand the demeanor and to assess the credibility of witnesses during their live testimony, we do not re-weigh the credibility of witnesses or attempt to resolve any conflicts in the evidence." *Id.*, citing *Tarray v. State*, 410 Md. 594, 608, 979 A.2d 729, 737 (2009). We defer to any possible reasonable inferences the jury could have drawn from the admitted evidence and need not decide whether the jury could have drawn other inferences from the evidence, refused to draw inferences, or whether we would have drawn different inferences from the evidence. *State v. Smith*, 374 Md. 527, 557, 823 A.2d 664, 682 (2003); *see also State v. Albrecht*, 336 Md. 475, 478, 649 A.2d 336, 337 (1994) ("[I]t is not the function or duty of the appellate court to undertake a review of the record that would amount to, in essence, a retrial of the case."). Our focus, then, while reviewing the evidence in a light most favorable to the State, is to determine whether any rational

jury could have concluded that Mayers employed "force or the threat of force" in order to perform cunnilingus on S.C.

Prior to 1976, our statutory scheme involving crimes of a sexual nature included sodomy, perverted practices and rape, although our jurisprudence discussing "force or the threat of force" developed in the context of rape. In 1976, the General Assembly enacted a new gender-neutral statutory scheme recognizing various degrees of sexual crimes,[4] one of which was second degree sexual offense:

> (A) A person is guilty of a sexual offense in the second degree if the person engages in a sexual act with another person:
>
> (1) By force or threat of force against the will and without the consent of the other person; . . . .

1976 Maryland Laws, Chapter 573. In 2002, then Section 464A of Article 27, codifying a second degree sexual offense, was repealed and reenacted, without substantive change, as Section 3–306 of the Criminal Law Article, Maryland Code (2002); it presently states:

---

4. See J. William Pitcher, *Rape and Other Sexual Offense Law Reform in Maryland 1976–1977*, 7 U. Balt. L.Rev. 151 (1977), for a discussion of the 1976 legislation, which was the product of a legislatively created Special Committee on Rape and Related Offenses. The Senate Judicial Proceedings Committee Report described a major purpose of the legislation, namely to delineate a broad spectrum of sex crimes:

> Despite the fact that the law does not presently recognize the concept, pragmatically there exist degrees of rape. The gamut runs from a brutal ravishment and murder to what has been euphemized as the "date rape"; this latter term referring to a situation wherein, more often than not, parties are acquainted (albeit shortly) and the aggressor is numbed by excessive ingestion of alcohol, sexually aggressive and likely to misinterpret the fearful cries of the victim. Failure of the law to recognize the infinite spectrum of human behavior in a sexual situation by dealing with one and all as rape, with its attendant penalty, has produced urgent need for re-examination of the one-category method of dealing with the problem. Therein lies the genesis for the main thrust of this legislation, i.e., the delineation into degrees of sexual offenses according to factors which logically reflect the probable severity of traumatic impact of the experience on the victim.

(a) *Prohibited.*—A person may not engage in a sexual act with another:

(1) by force, or the threat of force, without the consent of the other; . . . .

A "sexual act" is defined as "any of the following acts, regardless of whether semen is emitted: . . . (ii) cunnilingus," although the parties do not dispute that cunnilingus constitutes such an act. Maryland Code (2002), Section 3–301(e) of the Criminal Law Article.

Both our pre- and post–1976 jurisprudence, however, recognizes the notion of force as coextensive with resistance on the part of the victim and also emphasizes that resistance is relative and should be measured by the fact-finder. As early as 1923, in *Hill v. State*, 143 Md. 358, 122 A. 251 (1923), we considered whether there was sufficient evidence to convict Wesley Hill, Frank Thomas, Milford Thomas, and James Lewis of "assault with intent to commit rape," based upon the victim's testimony that the assailants convinced her to get into their buggy, drove her to a wooded area, and had, or attempted to have sexual intercourse with her, "forcibly and against her will." *Id.* at 361, 363–64, 122 A. at 252, 253. We determined that there was "ample" evidence to sustain a conviction, although the victim, who was characterized as "not a very strong minded person," had testified only that "she was resisting as well as she could." *Id.* at 364–65, 122 A. at 253. We reasoned that resistance, as indicative of the assailant's use of force, is relative and more properly determined by the jury:

> A timid woman may not resist such an attack as far as a fearless women would. In short, it cannot be said that all women would use the same amount of resistance, or that every woman would act in the same way at all times, under such circumstances as described by the prosecuting witness.

*Id.* at 367, 122 A.2d at 254. We further noted that the judges, "sitting as a jury," were due significant deference, because "they had the opportunity to judge [the testimony of the prosecuting witness], not only from what appears in the

record, but from what they saw of her at trial." *Id.* at 364–65, 122 A. at 253. Force, then, was recognized as essentially a subjective element as measured, in part, by the victim's resistance, because "it cannot be said that all women would use the same amount of resistance, or that every woman would act in the same way at all times." *Id.* at 367, 122 A. at 254.

Our jurisprudence additionally recognizes that a sexual crime also may be accomplished through the threat of force commensurate with the victim's fear of imminent death or serious bodily harm. In *Hazel v. State*, 221 Md. 464, 157 A.2d 922 (1960), we considered whether there was sufficient evidence of force or threats of force to sustain a rape conviction, when the assailant, Clifford Earl Hazel, approached the victim while she was unloading groceries with her three young children, wrapped his arm around her neck, and said, "I have a gun. If you move I will shoot the baby. You don't want me to kill the baby do you?" *Id.* at 466, 157 A.2d at 923. Hazel tied the victim's hands, brought her to the cellar of her home, told her to lie down on the floor, and engaged in sexual intercourse. The prosecuting witness testified that she did not struggle, because she "was afraid for . . . [her] life." *Id.* at 467, 157 A.2d at 924 (alteration in original). Hazel contended that the evidence was insufficient to sustain his rape conviction, because "the conduct of the prosecutrix was such as to render her failure to resist consent in law." *Id.* at 468, 157 A.2d at 924.

■ We noted that then Section 461 of Article 27, Maryland Code (1957), "although fixing the penalties, does not define the crime of rape," but determined that rape at common law, though, was generally defined as "the act of a man having unlawful carnal knowledge of a female over the age of ten years by force without the consent and against the will of the victim." *Id.* at 468–69, 157 A.2d at 924. We described the element of "force" as follows:

Force is an essential element of the crime and to justify a conviction, the evidence must warrant a conclusion either that the victim resisted and her resistance was overcome by

force or that she was prevented from resisting by threats to her safety. But no particular amount of force, either actual or constructive, is required to constitute rape. Necessarily that fact must depend upon the prevailing circumstances. As in this case force may exist without violence. If the acts and threats of the defendant were reasonably calculated to create in the mind of the victim—having regard to the circumstances in which she was placed—a real apprehension, due to fear, of imminent bodily harm, serious enough to impair or overcome her will to resist, then such acts and threats are the equivalent of force.

*Id.* at 469, 157 A.2d at 925. We determined that the evidence was sufficient to sustain the conviction because the issue of whether the intercourse "was accomplished by force and against the will was one of credibility," properly within the province of the trier of fact, in this case the trial court. *Id.* at 470, 157 A.2d at 925. Force or threats of force, then, "may exist without violence," and although force represents an essential element, "no particular amount of force, either actual or constructive, is required. . . ." *Id.* at 469, 157 A.2d at 925.

Subsequently, in *State v. Rusk,* 289 Md. 230, 424 A.2d 720 (1981), we considered whether there was sufficient evidence of "force or threat of force" to sustain the defendant's second degree rape conviction, pursuant to the statutory scheme, enacted in 1976, governing sexual offenses. Rusk was found guilty by a jury of second degree rape in violation of then Section 463(a)(1) of Article 27, Maryland Code (1957, 1976 Repl.Vol., 1980 Supp.), which stated, in part:

A person is guilty of rape in the second degree if the person engages in vaginal intercourse with another person: (1) By force or threat of force against the will and without the consent of the other person; . . . . [5]

---

5. In 2002 the General Assembly repealed and reenacted then Section 463 of Article 27, without substantive change, as Section 3–304 of the Criminal Law Article (2002). 2002 Md. Laws, Chap. 26. That provision states in relevant part:

In the case, the twenty-one-year-old victim, Pat, testified that on the evening of September 21, 1977, she had attended a high school alumni meeting where she met a female friend, Terry. The women decided to go out for drinks in Fells Point, and after bar hopping, arrived at an establishment known as E.J. Buggs. Rusk approached the women and began talking with Pat, and during their conversation both acknowledged being separated from their respective spouses and having a child. Pat told Rusk that she had to "go home because it was a week-night"; Rusk asked Pat to give him a ride to his apartment in the 3100 block of Guilford Avenue, to which she agreed.

Pat also testified that after a twenty-minute drive, they arrived at Rusk's apartment. She further testified that she was totally unfamiliar with the area. When they arrived, Rusk asked Pat to come in to his apartment, but she refused. He persisted; she again declined. Despite her repeated refusals, Pat testified that Rusk reached over, turned off the ignition to her car, took her car keys, walked over to her car door, opened the door and said, " 'Now will you come up?' " *Id.* at 232–33, 424 A.2d at 721. After they arrived at the apartment, Rusk pulled her by the arms to the bed and began to undress her:

"I was still begging him to please let, you know, let me leave. I said, 'you can get a lot of other girls down there, for what you want,' and he just kept saying, 'no'; and then I was really scared, because I can't describe, you know, what was said. It was more the look in his eyes; and I said, at that point—I didn't know what to say; and I said, 'If I do what you want, will you let me go without killing me?' Because I didn't know, at that point, what he was going to do; and I started to cry; and when I did, he put his hands on my throat, and started lightly to choke me; and I said,

(a) *Prohibited.*—A person may not engage in vaginal intercourse with another:

(1) by force, or the threat of force, without the consent of the other; . . . .

'If I do what you want, will you let me go?' And he said, yes, and at that time, I proceeded to do what he wanted me to."

*Id.* at 234–35, 424 A.2d at 722.

■ The Court of Special Appeals, sitting en banc, reversed Rusk's conviction, concluding that, in view of the prevailing law established in *Hazel,* insufficient evidence of "force or the threat of force" had been adduced at trial to permit the case to go to the jury. Relying upon *Hazel,* we reinstated Rusk's conviction because we recognized that, when a victim submits in the face of an assailant's threat of serious harm, the ensuing act of sexual intercourse "amount[s] to a felonious and forcible act of the defendant against the will and consent of the prosecuting witness." *Id.* at 243, 424 A.2d at 726 (internal quotation marks omitted). A reasonable jury, we opined, could have concluded that Rusk employed threats of force under the circumstances presented by Pat in her testimony:

From her testimony, the jury could have reasonably concluded that the taking of her car keys was intended by Rusk to immobilize her alone, late at night, in a neighborhood with which she was not familiar; that after Pat had repeatedly refused to enter his apartment, Rusk commanded in firm tones that she do so; that Pat was badly frightened and feared that Rusk intended to rape her; that unable to think clearly and believing that she had no other choice in the circumstances, Pat entered Rusk's apartment; that once inside Pat asked permission to leave but Rusk told her to stay; that he then pulled Pat by the arms to the bed and undressed her; that Pat was afraid that Rusk would kill her unless she submitted; that she began to cry and Rusk then put his hands on her throat and began " 'lightly to choke' " her; that Pat asked him if he would let her go without killing her if she complied with his demands; that Rusk gave an affirmative response, after which she finally submitted.

*Id.* at 246, 424 A.2d at 728. We reasoned that the Court of Special Appeals erred by substituting "[its] own view of the

evidence (and the inferences that may fairly be drawn from it) for that of the judge and jury ... [and had thereby] improperly invaded the province allotted to those tribunals." *Id.* at 245, 424 A.2d at 727 (alterations in original) (citation omitted). We reiterated in *Rusk* that, "where persuasion ends and force begins in [sexual assault cases] is essentially a factual issue," to be determined by the trier-of-fact.[6] *Id.* at 246, 424 A.2d at 728.

---

**6.** In *Martin v. State*, 113 Md.App. 190, 686 A.2d 1130 (1996), our colleagues on the Court of Special Appeals had occasion to consider whether sufficient evidence of the threat of force was adduced to sustain a second degree sexual offense conviction. In that case, the defendant was found guilty, after a bench trial, of second degree sexual offense, third degree sexual offense, and fourth degree sexual offense, as well as committing an assault and battery. Martin challenged his second degree sexual offense conviction, contending that there was insufficient evidence of "force or threat of force," pursuant to then Section 464(A) of Article 27, Maryland Code (1957, 1996 Repl.Vol.), which stated, in part:

> A person is guilty of a sexual offense in the second degree if the person engages in a sexual act with another person: (1) By force or threat of force against the will and without the consent of the other person....

In that case, M.N. attended a concert at the Merriweather Post Pavilion in Columbia, had consumed large quantities of alcohol and inhaled nitrous oxide, an intoxicating substance. After the concert, M.N. began walking in the general direction of her residence in Montgomery County, and was observed by Martin, who was then serving as a sergeant in the Howard County Police Department. After accepting a ride from Martin, M.N. testified that she fell asleep, and later awoke when the police car came to a stop in an unfamiliar "dark area." Martin proceeded to place his hands underneath M.N.'s shorts and began fondling her vagina and repeatedly placed his fingers in her vagina. Martin also placed a mini-flashlight in her vagina, while M.N. feigned sleep. M.N. testified that she did not physically resist or tell him to stop, because she was afraid that Martin would hurt her, or even kill her, to prevent her from reporting what was taking place. She also believed, by virtue of his being a police officer, that Martin was armed with a handgun.

The intermediate appellate court determined that although there were no overt verbal or physical threats, there were other circumstances, including Martin's status as a uniformed and armed police officer, that likely intimidated M.N. into submission, commensurate with threats of force. The court further reasoned that "[i]n light of the myriad circumstances that can arise, the reasonableness of a victim's non-resistance is usually best left to the fact finder." *Id.* at 247, 686 A.2d at 1158, citing *Rusk*, 289 Md. at 245, 424 A.2d at 727.

Mayers, nevertheless, refers us to *Lane v. State*, 348 Md. 272, 703 A.2d 180 (1997), *Johnson v. State*, 232 Md. 199, 192 A.2d 506 (1963), *Giles v. State*, 229 Md. 370, 183 A.2d 359 (1962), as well as several opinions from the Court of Special Appeals, including *Robinson v. State*, 151 Md.App. 384, 827 A.2d 167 (2003), *Rhodes v. State*, 74 Md.App. 680, 539 A.2d 1160 (1988), *Robinson v. State*, 67 Md.App. 445, 508 A.2d 159 (1986), cert. denied, 377 Md. 276, 833 A.2d 32 (2003), *Rice v. State*, 9 Md.App. 552, 267 A.2d 261 (1970), and *Blotkamp v. State*, 45 Md.App. 64, 411 A.2d 1068 (1980), essentially contending that the factual scenarios in those cases demonstrate that the assailant's use of force or the threat of force must be more violent in order to constitute a violation of the statute. In *Lane*, the victim was awakened by her husband who jumped on top of her, grabbed her wrists, digitally penetrated her vagina, and slapped her face from side to side with his penis, attempting to insert it into her mouth. *Id.* at 276–77, 703 A.2d at 182. In *Johnson* and the companion case, *Giles*, a sixteen-year-old woman, Joyce Roberts, her boyfriend, and two other young men had driven to a secluded spot to swim and were approached by the assailants after their car stalled. The men demanded cigarettes and money, threatened to "carnally know the girl," shattered the car windows by throwing rocks at the vehicle, and threatened to shoot Roberts's boyfriend if she did not submit. When Roberts attempted to flee, the men gave chase, knocked her to the ground, and "had sexual relations with her." *Johnson*, 232 Md. at 203, 192 A.2d at 508.

In *Robinson*, the "mentally defective" victim testified that her assailant forced her to engage in vaginal and anal intercourse despite her cries, and also threatened to "hurt [her]" if she continued to scream. 151 Md.App. at 399, 827 A.2d at 176. In *Rhodes*, the victim testified that her assailant, armed with a handgun, threatened to knock her out of the window, pushed her into a bedroom and backwards onto the bed, and engaged in vaginal intercourse. *Rhodes*, 74 Md.App. at 682–83, 539 A.2d at 1161. In *Robinson*, the prosecuting witness testified that her assailant pointed a screwdriver at her and her infant

son while he proceeded to engage in sexual intercourse. *Id.* at 448, 508 A.2d at 160–61. In Rice, the assailant broke into the prosecuting witness's apartment, put his hand over her mouth, blocked her escape and repeatedly engaged in oral sex and vaginal intercourse. *Rice,* 9 Md.App. at 555–58, 267 A.2d at 263–65. Finally, in *Blotkamp,* the victim was working by herself at night when the defendant threatened her with a knife and engaged in sexual intercourse causing substantial injuries to her genital area requiring surgical suturing. 45 Md.App. at 65–66, 411 A.2d at 1069.

Relying upon these cases, Mayers argues that the statutory standard may only be met by physical violence, but it is clear that the legislative requirement of force or the threat of force is not limited to physical violence. Rather, our jurisprudence recognizes that the measure of an assailant's use of force or the threat of force is within the province of the trier-of-fact; it is not our role to retry the case or circumvent the fact-finder just because in other cases we, or our colleagues on the intermediate appellate court, were presented with physical violence perpetrated against the victim.

Mayers also attempts, nevertheless, to analogize the present case to *Goldberg v. State,* 41 Md.App. 58, 395 A.2d 1213 (1979), in which our colleagues on the intermediate appellate court determined that there was insufficient evidence to sustain the defendant's second degree rape conviction. In that case, the eighteen-year-old prosecutrix was approached by the defendant while working as a sales clerk at Towson Plaza and was sold a story that he was a freelance agent and thought she was "an excellent prospect to become a successful model." *Id.* at 59, 395 A.2d at 1214. When they arrived at the defendant's home, he "motioned" for her to sit beside him on the bed and told her, "I am not going to hurt you." She testified that she removed her clothing because she was "just really scared," and that he guided her onto the bed and began having sexual intercourse with her. *Id.* at 61–62, 395 A.2d at 1215–16.

The Court of Special Appeals determined that there was insufficient evidence that the defendant employed force or

threats of force, because there was nothing in the record demonstrating that the victim offered any resistance and the prosecuting witness testified that the defendant did not threaten her in any way. In contrast, however, in the present case, S.C. resisted both verbally, by saying "no" over and over again, and also physically, by pushing Mayers's hands away from her breast and vagina, while experiencing fear that Mayers would force her to perform fellatio on him or that she would contract a sexually transmitted disease in the absence of a condom.

In the present case, we conclude that a reasonable jury could have determined that Mayers employed force or the threat of force to perpetrate the act of cunnilingus on S.C. In terms of force, S.C. verbally resisted Mayers's advances, saying "no" over and over again. When Mayers would not relent, S.C. also physically resisted, pushing his hands away from her breast and vagina. S.C. further testified that Mayers took off her shorts by "getting on top of her," evidence of the application of force beyond that which is part of the sexual act itself.

Furthermore, S.C. testified regarding her fear of Mayers. S.C. recounted that she was awakened from sleep, having complained of being ill, and also that Mayers smelled of alcohol and marijuana. S.C. further testified that she repeatedly said "no," but that Mayers would not relent, and also physically resisted, to no avail, such that she feared that Mayers would use her for his own sexual gratification regardless of her unwillingness. Finally, S.C. recounted that she was "horrifically scared" and paralyzed by the fear of contracting a sexually transmitted disease or being forced to perform fellatio on him. Based upon all of these circumstances, a rational jury certainly could conclude that Mayers perpetrated the act of cunnilingus on S.C. by force or threats of force. Therefore, Mayers's conviction must stand.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO AFFIRM THE JUDGMENT**

OF THE CIRCUIT COURT FOR SOMERSET COUNTY;
COSTS IN THIS COURT AND IN THE COURT OF SPE-
CIAL APPEALS TO BE PAID BY RESPONDENT.