60 A.3d 50

**Dewan HOLMES**

v.

**STATE of Maryland.**

**No. 2128, Sept. Term, 2011.**

Court of Special Appeals of Maryland.

Jan. 24, 2013.

Matthew H. Blumenstein (Williams & Connolly, LLP, Paul B. DeWolfe, Public Defender, on the brief) Washington, DC, for appellant.

Ryan R. Dietrich (Douglas F. Gansler, Atty. Gen., on the brief) Baltimore, MD, for appellee.

Panel: KEHOE, BERGER, and RONALD B. RUBIN (Specially Assigned), JJ.

BERGER, J.

On September 8, 2011, appellant, Dewan Holmes ("Holmes") was convicted by a jury in the Circuit Court for Baltimore City. Holmes was convicted of first-degree assault; using a handgun during the commission of a crime of violence; wearing, carrying, or transporting a handgun; possessing a regulated firearm after having been convicted of a disqualifying felony; and discharging a firearm within the city limits of Baltimore City. Holmes was acquitted of attempted first-degree murder and attempted second-degree murder.

Thereafter, the trial court sentenced Holmes to 15 years imprisonment for first-degree assault; 15 years for using a handgun in the commission of a crime of violence (concurrent with the assault sentence); three years for wearing, carrying, or transporting a handgun (also concurrent with the assault

sentence); five years for possessing a regulated firearm after having been convicted of a disqualifying felony (consecutive to the assault sentence); and one year for discharging a firearm within Baltimore City limits (concurrent with the assault sentence), for a total of 20 years of imprisonment.

Holmes filed a timely appeal and presents four issues for our review, which we have expanded and rephrased as follows:

1. Whether the evidence presented at trial was sufficient to sustain Holmes's convictions beyond a reasonable doubt.

2. Whether the circuit court erred in replying to a jury note by deviating from the language used in Maryland Criminal Pattern Jury Instruction 2:01.

3. Whether the circuit court erred in denying Holmes's motion for new trial.

4. Whether the circuit court erred in failing to merge Holmes's sentence for wearing, carrying or transporting a handgun, with the sentence imposed for using a handgun during the commission of a crime of violence.

5. Whether the circuit court erred by invoking impermissible considerations in sentencing Holmes.[1]

For the reasons set forth below, we affirm the judgments of the Circuit Court for Baltimore City. We, however, merge Holmes's sentence for wearing, carrying, or transporting a

---

1. Holmes frames the questions for review as follows:

 1. Whether there was sufficient evidence at trial to find beyond a reasonable doubt that Mr. Holmes discharged or possessed a firearm, used a handgun, or committed first-degree assault, where there was no physical evidence he did so, no testimony as to certain key elements, and no reliable testimony as to others.

 2. Whether the trial court erred in giving the deadlocked jury an instruction that substantially deviated from Maryland Criminal Pattern Jury Instruction 2:01.

 3. Whether the trial court erred in denying a motion for a new trial where the jury foreman witnessed Mr. Holmes shackled and in official custody during deliberations.

 4. Whether the trial court erred at sentencing by failing to merge Mr. Holmes's sentences and by invoking impermissible considerations.

handgun into Holmes's sentence for use of a handgun during the commission of a crime of violence.

## FACTS AND PROCEEDINGS

On December 15, 2009, Keytwan Deputy ("Deputy") traveled from out-of-town to visit his father, Debro Muhammad ("Muhammad")[2] in Baltimore City. Some time later that evening, Deputy visited a friend of his father, a man by the name of Standsberry Lee ("Lee"). In addition to Deputy, Muhammad, and Lee, a handful of other individuals were present at Lee's house that evening, including Bruenell Coleman ("Coleman"), a man identified as "K.J.," and another man that was referred to as "Q." While at Lee's house, Deputy decided to use the computer. After browsing the internet for approximately ten minutes, Deputy heard a knock at the front door. Deputy testified that K.J. stood up, opened the front door, and an individual entered the residence who sat down in the living room next to K.J. According to the record, Deputy identified the individual as Holmes through the use of a photographic array.

From his seat in the living room, Holmes called out to Deputy to inquire where he was from and what he was doing. Without answering Holmes's question, Deputy responded: "[O]h, it's just a little website thing with girls on here." Thereafter, Holmes stood up, brought his chair over to where Deputy was, and sat down next to him.[3] Deputy testified that he was "uncomfortable" at this point and so he ignored Holmes for as long as possible. As Holmes persisted with criticisms and questions, Deputy finally responded by stating that:

> [M]an, dog, I don't even know you. So why did you take your chair and come sit over here next to me. Take your

---

2. Muhammad did not testify at trial.

3. Deputy testified that he was kneeling on the floor as he was using the computer.

chair and go back over there and sit by the front door where you were sitting at before you sat next to me. Holmes responded that "he wasn't going nowhere [and that] he ain't moving."

After Holmes remained on his knees for approximately 20 to 30 more seconds, Deputy then advised Holmes that if he said anything else, Deputy would "beat him up." Holmes replied with "okay, okay, all right, all right," at which point Holmes then "grabbed his jacket, slowly put his jacket on real nice and calm and then he left." Moments later, Deputy heard a knock at the door. K.J. answered the door and Holmes re-entered the house. Deputy testified that:

> When [Holmes] came in, he shut the door behind him, he lift his shirt up. When he lift his shirt up he's drawing a handgun. It was a revolver from his waistband and said, talk that shit now.

Deputy described the revolver as a "357" with a "western style butt" and a "long nose." At trial, Deputy demonstrated, with his hands, the length of the barrel for the jury.

After Holmes revealed the revolver, Deputy began running through the residence away from Holmes. Deputy ran down a hallway, turned right into a bedroom, and ran straight through a glass window. Deputy testified that:

> When I crashed through the window—I felt down to the ground. As I'm getting up I heard something go pow and the glass was cutting my hands up from the glass being on the ground from me jumping through the window. I took off running.

Deputy further described the "pow" as a gunshot.

After running for a few blocks, Deputy hid behind a house. Approximately five minutes later, Deputy "peeked" his head out from behind a wooden fence and saw an individual who he believed was Holmes and another individual with him. Deputy again took off running, and eventually came to a place with which he was familiar. Deputy began knocking on doors to houses, and eventually was able to find someone who provided him with water and alerted the paramedics. While being

inspected for injuries on a porch, Deputy was told by the paramedics that he was shot. Thereafter, Deputy was transported to a hospital and treated for a gunshot wound to his right leg, along with other cuts from the shattered glass.

At trial, Coleman testified that he shared a residence with Lee, and at the time that Deputy arrived that evening, Coleman was in his bedroom watching a football game. When Deputy was using Lee's computer to access the internet, Coleman left the residence to purchase a snack. When Coleman returned two to three minutes later, Coleman witnessed Holmes leaving the residence. Coleman then closed and locked the front door, and returned to his bedroom. Shortly thereafter, Coleman witnessed Deputy running into his bedroom through his closed glass window.

Coleman further testified that he witnessed K.J. "tussling" with Holmes near the front door of the residence. Moreover, when Coleman identified Holmes soon after the shooting through a photographic array, Coleman wrote: "[T]he person I pick out [was] the person in the door with the guns." Lee, however, testified at trial that the individual who came back with the gun was not Holmes. Nevertheless, evidence was admitted that Lee had told Detective Jeffrey Rivera ("Detective Rivera") during an interview that Holmes was the individual "who was in the house with the gun."

The jury began deliberations on September 7, 2011 which continued into the following day. On the second day, the jury submitted a note to the court stating that "[w]e are unable to meet an agreement on three charges. What are our options for next steps in the proceeding? Thank you." The court instructed the jury that they were to "[c]ontinue in [their] deliberations." The defense moved for a mistrial, which the circuit court denied.[4] More than one hour later, the jury reached a verdict. The jury returned a guilty verdict on five of the seven counts.

---

4. It is noteworthy that Holmes moved for a mistrial because the jury was deadlocked, not because the trial judge had instructed the jury to continue deliberating.

Shortly after the jury rendered its verdict, defense counsel informed the court that Holmes had told her that one of the jurors saw him in shackles while he was escorted by a correctional officer in the hallway. Defense counsel explained to the court that, upon initially learning of this, she had investigated the incident by speaking with one of the correctional officers involved and with that officer's sergeant, both of whom denied that the incident occurred. The trial court eventually questioned the foreman and the foreman confirmed that, in delivering the jury's "[s]econd question," he had seen Holmes while "they was bringing him in." In response to questioning, the foreman stated that he "didn't notice" that Holmes was shackled at the time, and he denied that the incident impacted his verdict.

Thereafter, defense counsel filed a motion for a new trial on the ground that the jury foreman viewed the defendant in shackles and in custody which violated Holmes's right to a fair trial. The circuit court denied the motion and determined that Holmes "had to have been shackled at the time" when the juror saw him, and that "there is reasonable concern of prejudice during the course of deliberation." Nevertheless, the court found that the juror "did not see that he was being escorted," and that "there was no prejudice of the Defendant being seen in the hallway by the juror."

Upon a review of the facts and circumstances of the case, as well as Holmes's prior contacts with the criminal justice system, the circuit court sentenced Holmes to 20 years incarceration for all five convictions. This timely appeal followed.

## DISCUSSION

### I.

When reviewing the sufficiency of the evidence in a criminal trial, this Court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)

**438**

(citation omitted); *see also Titus v. State,* 423 Md. 548, 557–58, 32 A.3d 44 (2011); *Allen v. State,* 402 Md. 59, 71, 935 A.2d 421 (2007). The purpose is not to "undertake a review of the record that would amount to, in essence, a retrial of the case." *State v. Albrecht,* 336 Md. 475, 478, 649 A.2d 336 (1994). Indeed, "[i]t is not our role to retry the case", *Smith v. State,* 415 Md. 174, 185, 999 A.2d 986 (2010), because the finder of fact has "the unique opportunity to view the evidence and to observe first-hand the demeanor and to assess the credibility of witnesses during their live testimony." *State v. Mayers,* 417 Md. 449, 466, 10 A.3d 782 (2010) (internal quotations omitted) (quoting *Smith, supra,* 415 Md. at 185, 999 A.2d 986). Accordingly, "we do not re-weigh the credibility of witnesses or attempt to resolve any conflicts in the evidence." *Id.*

"A fact-finder is free to believe part of a witness's testimony, disbelieve other parts of a witness's testimony, or to completely discount a witness's testimony." *Pryor v. State,* 195 Md.App. 311, 329, 6 A.3d 343 (2010). Furthermore, we recognize that "the finder of fact has the ability to choose among differing inferences that might possibly be made from a factual situation." *Smith, supra,* 415 Md. at 183, 999 A.2d 986 (internal quotations omitted). As such, we "defer to any possible reasonable inferences the [trier of fact] could have drawn from the admitted evidence." *Mayers, supra,* 417 Md. at 466, 10 A.3d 782 (citing *State v. Smith,* 374 Md. 527, 557, 823 A.2d 664 (2003)). Additionally, we "need not decide whether the [trier of fact] could have drawn other inferences from the evidence, refused to draw inferences, or whether we would have drawn different inferences from the evidence." *Id.*

In the instant case, Holmes's first contention is that the circuit court erred in denying his motion for a judgment of acquittal[5] because the evidence was insufficient to establish

---

5. The defense moved for a judgment of acquittal at the close of the prosecution's case-in-chief. Holmes argued that the prosecution had presented insufficient evidence that he possessed a firearm, that the firearm was operable, and that he used an operable firearm to shoot a

that Holmes was in possession of a firearm. Holmes further argues that the evidence was insufficient to prove that he discharged the firearm towards Deputy, causing Deputy to be struck by a bullet. As a result, Holmes claims that all of his convictions must be reversed. The State counters that "all of Holmes's convictions must be upheld" because the evidence was sufficient to establish that: (1) Holmes was in possession of a regulated firearm after having been convicted of a disqualifying crime; (2) Holmes discharged a handgun within the city limits of Baltimore City; (3) Holmes wore, carried, or transported a handgun; (4) Holmes committed first-degree assault; and (5) Holmes used a handgun during the commission of a crime of violence. We hold that the evidence was sufficient for a jury to convict Holmes on all counts beyond a reasonable doubt. We now turn to a review of each conviction.

## A. Possession of a Firearm

At trial, the court instructed the jury that "a firearm is a weapon that propels a bullet or missile or projectile by gunpowder or some similar explosive." Under the Maryland Code, a handgun "means a pistol, revolver, or other firearm capable of being concealed on the person." Md.Code Ann., Crim. Law ("CR") § 4–201(c)(1) (LexisNexis 2012). To qualify as a "handgun," a device must be a "firearm." Further, in order to qualify as a "firearm," it "must propel a missile by gunpowder or some such similar explosive" or "be readily or easily converted into a device capable of so propelling a missile." *Wright v. State*, 70 Md.App. 616, 620, 522 A.2d 401 (1987) (internal quotations omitted) (quoting *Howell v. State*, 278 Md. 389, 396, 364 A.2d 797 (1976)); *see also Moore v. State*, 189 Md.App. 90, 108, 983 A.2d 583 (2009). Accordingly, the circuit court's instruction to the jury on the use of the term "firearm" was consistent with the law.

---

bullet into Deputy's leg. The circuit court denied Holmes's motion as to all counts.

According to the record, Deputy testified that when Holmes returned to Lee's residence, Holmes "lift[ed] his shirt up" and "at the same time [he was] lifting his shirt up he [drew] a handgun. It was a revolver from his waistband and said, talk that shit now." Moreover, Deputy described the handgun as a "357," "long, long nose" that appeared to have a "western type butt of a gun." Deputy further testified that he did not hear the shot inside the residence. After Deputy "crashed" through the bedroom window, he detected the gunshot. Holmes argues that because "[o]nly one eyewitness—Mr. Deputy—testified that Mr. Holmes possessed a gun," that testimony was insufficient evidence to prove Holmes was in possession of a firearm. Critically, Deputy identified Holmes as the individual possessing a firearm. Furthermore, evidence was presented that both Lee and Coleman provided statements to police officers in which they stated that they saw Holmes with a firearm that evening.

Although their testimony at trial differed from what they previously told police officers, both Lee and Coleman's prior statements indicated that Holmes was in possession of a handgun. As such, the prior statements could be used as substantive evidence that Holmes was in possession of a handgun, which was properly before the jury. Accordingly, the jury had every right to weigh and consider all of the evidence submitted at trial in reaching its verdict. The jury had the "unique opportunity to view the evidence and to observe first-hand the demeanor and to assess the credibility of witnesses during their live testimony." *Mayers, supra,* 417 Md. at 466, 10 A.3d 782. Indeed, "we do not re-weigh the credibility of witnesses or attempt to resolve any conflicts in the evidence." *Id.* Therefore, the evidence adduced at trial provided a sufficient basis from which the trier of fact, i.e., the jury, could conclude that Holmes was in possession of a handgun on the evening of December 15, 2009.

Further, because the evidence was sufficient to establish that Holmes was in possession of a handgun, the evidence was also sufficient to establish that Holmes was in possession of a

regulated firearm after having been convicted of a disqualifying crime. In order for the jury to reach a conviction for this count, the jury was required to find that Holmes: (1) was in possession of a handgun; and (2) had a conviction that disqualified him from possessing a handgun. It is clear from the record that the first prerequisite, i.e., possession of a handgun, was properly before the jury. Additionally, the record reveals that the parties stipulated that Holmes had been convicted of a crime that disqualified him from possessing a handgun. Accordingly, the evidence was sufficient to sustain Holmes's conviction for possession of a regulated firearm after having been convicted of a disqualifying felony.

### B. Discharge of a Firearm

■ Holmes maintains that there was "no physical evidence that [he] discharged a firearm" because "[t]here was no firearms evidence found" at or near the location of the incident. Holmes further claims that "Mr. Deputy has never said he saw [him] discharge a firearm—a critical void in the prosecution's evidence given that Mr. Deputy's wound is in *the front* of his leg." Nevertheless, the evidence submitted at trial was sufficient for the jury to reasonably conclude Holmes discharged a firearm.

Holmes challenges the allegation that his handgun was discharged because there was a lack of any "ballistics evidence." Critically, Holmes fails to provide any basis or reason as to why such evidence would be found or detected in Lee's residence. The record is clear that Deputy testified Holmes was in possession of a revolver. No evidence was presented at trial to dispute that the firearm was a revolver or that a revolver would leave behind "shell casings" or "ballistics evidence" if discharged. In addition, because Deputy was treated at a different location, a search of Lee's residence might not contain any ballistics evidence. Further, a search of Lee's residence did not occur until "later that day," providing ample opportunity for Holmes, witnesses, and evidence to be affected.

Moreover, the mere fact that Deputy did not witness Holmes discharge a firearm is not dispositive. Deputy testified that after he ran through the bedroom window, he immediately heard a gunshot while he was outside of Lee's house. Based on the evidence submitted at trial, it was reasonable for the jury to infer that Holmes was the only individual in possession of a firearm that evening. Thus, the jury was presented with ample circumstantial evidence to infer that it was Holmes who fired the handgun.

Similarly, Deputy's testimony that "he was not aware of being shot" initially does not preclude the jury from inferring that Holmes discharged the firearm. It is simply another consideration to be weighed by the jury in its deliberations. Further, Holmes asks us to speculate that the gunshot that wounded Deputy could have been fired by either of the two individuals that were witnessed with Holmes that evening. No evidence or testimony was presented at trial to support the notion that either of these persons were in possession of a firearm.

Furthermore, it is unreasonable to speculate—as Holmes asks us—that Deputy "accidentally shot himself in the front of the leg ... upon falling from Mr. Lee's window." Indeed, there was no evidence presented at trial that Deputy was in possession of a firearm, let alone discharged a firearm. Holmes sets forth additional hypotheses, but this Court limits its consideration to the record established at trial. Accordingly, we "defer to any possible reasonable inferences the [trier of fact] could have drawn from the admitted evidence." *Mayers, supra.* Therefore, we hold that there was sufficient evidence for the jury to infer that Holmes discharged a firearm.

As a result, there was sufficient evidence to convict Holmes of discharging a firearm within the limits of Baltimore City. There was no dispute in the record that the incident in question took place in Baltimore City. As such, there was sufficient evidence for the jury to conclude that Holmes discharged a firearm within the jurisdictional limits of Baltimore

City, violating the Baltimore City Code.[6] Baltimore, Md., Police Ordinances art. 19, § 59–2(a) (2012).

## C. Wearing, Carrying, or Transporting a Handgun

█ The circuit court's instruction for the charge of wearing, carrying, or transporting a handgun provided that "the State must prove that the Defendant wore, carried or transported a handgun that was in his reach and available for his immediate . . . use." CR § 4–203. As set forth above, the evidence was sufficient to establish that Holmes carried a handgun on his person and that the handgun was available for his immediate use. Accordingly, Holmes's conviction for wearing, carrying, or transporting a handgun is supported by sufficient evidence educed at trial.

## D. First–Degree Assault

█ The jury was presented with two theories under which it could find Holmes guilty of first-degree assault. Although the jury was not required to specify the theory upon which Holmes's conviction was based, the evidence was sufficient to sustain a conviction under either theory.

█ The jury was instructed that it could convict Holmes of first-degree assault if it found that Holmes: (1) caused an offensive touching that was intentional and to which Deputy did not consent; (2) used a firearm to commit the assault; and (3) intended to cause serious physical injury in the commission of the assault.[7] According to the record, evidence was suffi-

---

**6.** Article 19, § 59–2(a) of the Baltimore City Code states that:

(a) *Prohibited Conduct; penalties.*
If any person shall fire or discharge any gun, pistol, or firearm within the City, unless it be on some occasion of military parade, and then by order of some officer having the command, every such person for every such offense shall be guilty of a misdemeanor and, upon conviction, pay a fine not to exceed $1,000, or be imprisoned for a term not to exceed 1 year, or both.

**7.** We are constrained to note that the trial court misstated the law in its instruction on the first theory of first-degree assault. Under CR § 3–202, first-degree assault does not require both the intent to cause

cient to prove that Holmes caused an offensive touching through the use of a firearm by aiming and shooting at Deputy. Further, the jury could infer that shooting at a person would cause serious physical injury. Accordingly, the evidence was sufficient to support a conviction for first-degree assault under this theory.

The jury was also instructed that it could convict Holmes of first-degree assault if it found that: (1) Holmes committed an act with the intent of placing Deputy in fear of an immediate physical contact; (2) Holmes had the apparent ability to bring about that contact; (3) Deputy reasonably feared that contact; (4) the assault involved the use of a firearm; and (5) Holmes intended to cause serious physical injury in the commission of the assault. Upon a review of the record, there was sufficient evidence to establish each of these elements.

Deputy testified that Holmes returned to Lee's residence with two unidentified individuals after engaging in an argument with Deputy. Deputy further testified that Holmes removed a handgun from his waistband making a threatening remark towards Deputy. As a result, there was sufficient evidence for the jury to infer that Holmes's act was done for the purpose of placing Deputy in fear of harm or contact. Similarly, by removing the handgun from his waistband, Holmes had the ability to cause Deputy serious physical injury. Deputy testified that he ran quickly out of the room and took exceptional measures by crashing through a bedroom window in an effort to avoid being shot by Holmes. Further, Holmes's display of the firearm was in relatively close proximity to Deputy,[8] which was sufficient for the jury to infer that such a display would cause Deputy serious physical injury if

---

serious physical injury to another and the use of a firearm. Nevertheless, the misstatement is of no consequence because the evidence was sufficient to support either theory of first-degree assault under the instructions provided.

8. It is unclear from the record the exact distance Holmes stood from Deputy, but both individuals were in the living room area of the residence.

he attempted to flee. Accordingly, the evidence was sufficient to support a conviction for first-degree assault under either of the theories presented to the jury.

### E. Use of a Handgun During the Commission of a Crime of Violence

Holmes further argues that there was insufficient evidence presented to prove beyond a reasonable doubt that Holmes used a handgun during the commission of a crime of violence. In order for the jury to convict Holmes of this offense, the jury was required to find that: (1) Holmes committed a crime of violence; and (2) he used a handgun during the commission of that crime. CR § 4–204. The jury was instructed that a crime of violence included both first and second-degree assault. Indeed, there was sufficient evidence to establish that Holmes was in possession of a handgun. Moreover, because the evidence was sufficient to establish that Holmes committed first-degree assault, the evidence was sufficient for the finder of fact to infer that Holmes committed a crime of violence. Therefore, there was sufficient evidence presented at trial for the jury to find that Holmes used a handgun during the commission of a crime of violence.

## II.

Holmes's second contention is that the trial court erred in instructing the jury to "continue in your deliberations" when the trial court received a note from the jury. The note provided that: "[w]e are unable to meet an agreement on three charges. What are our options for next steps in the proceeding? Thank you." Holmes maintains that the trial court's response to the jury "differs markedly from Maryland Criminal Pattern Jury Instruction ("MPJI–CR") 2:01 and, as such, was an abuse of discretion." [9] We disagree for two reasons. First, Holmes's claim was not preserved for appel-

---

9. Such instructions are commonly referred to as an *"Allen* charge." The term *"Allen* charge" is derived from the instruction given to a deadlocked jury which was considered by the Supreme Court in *Allen v. United States,* 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896). The

late review because he failed to note an objection to the court's response to the jury's note on the grounds he now raises on appeal. Further, assuming *arguendo* Holmes's claim is preserved, the circuit court did not abuse its discretion in its response to the jury's note to the court.

 Holmes challenges the substance of the language used in the trial court's response in that it was "impermissibly coercive" because it deviated from the approved language in MPJI–CR 2:01. Holmes's contention is not preserved for appellate review because he raises this claim for the first time at the appellate level. The following colloquy ensued at the trial level:

> THE COURT: We just received a note from the jury that says, "we are unable to meet an agreement on three charges. What are our options for next steps in proceeding? Thank you."
>
> I just wanted you to be aware of this communication and as such. I know you have to talk to your client and we have to discuss in the court, but do you have any idea what you want to do?
>
> [DEFENSE COUNSEL]: Continue deliberating.
>
> THE COURT: Well,—just wanted you to know what was going on. And because once we get past this I'm moving my other trial along. Okay. Step to the table. The Defendant will be in the courtroom in one minute.
>
> [DEFENSE COUNSEL]: Yes, Your Honor.
>
> * * *
>
> THE COURT: Bring him to the table, please. At the moment unhook his hands only, please. Call your case for the record, please.

---

instruction is intended to promote unanimity in jury decisions, as well as to encourage jurors to consider the viewpoints of their fellow jurors. The term "modified *Allen* charge" is used to distinguish the jury instruction sanctioned by the Court of Appeals in *Kelly v. State*, 270 Md. 139, 140 n. 1, 310 A.2d 538 (1973) from the specific instruction given in *Allen*. The sanctioned instruction is now found in MPJI–CR 2:01, which the Court of Appeals has required in every instance where such an instruction is necessary.

[PROSECUTOR]: Good morning, Your Honor. Calling State of Maryland versus Dewan Holmes, case numbers 110025014 and 15, [prosecutor] on behalf of the State.

[DEFENSE COUNSEL]: [Defense counsel] on behalf of Mr. Holmes.

THE COURT: Counsel, be aware we received a note from the jury at 11:30. The mote [sic] from the jury reads, "we are unable to meet an agreement on three charges. What are our options for next steps in proceeding? Thank you."

[DEFENSE COUNSEL]: If I could have a few moments with my client, Your Honor.

THE COURT: Thank you. Let me interrupt you a moment, please. Be aware is that the court is about to advise the jury that they are to continue deliberation is what I'm about to advice [sic] them.

[DEFENSE COUNSEL]: Oh. So—I'm sorry. I thought you were asking us what we would request.

THE COURT: I'm about to ask you is there anything you wish to place on the record at this time?

[DEFENSE COUNSEL]: Your Honor, understanding what Your Honor has just said, but for the record Defense would ask for a mistrial at this point.

THE COURT: Your motion is denied at this time. Is that the court will ask the jury to continue its deliberations. There's no reason for us to conclude that a mistrial is in order at this time.

I will advise you, however, in about an hour or so is lunch time and it is my intent to send them to lunch and bring them back to continue deliberation if they have no [sic] reached a verdict.

You have a right to be present when that occurs or you can choose not to be present and allow—understand that the clerk will about 1:00 o'clock or 1:15 instruct them to go to lunch and return back in the jury room and continue deliberation. What's your pleasure?

[DEFENSE COUNSEL]: We don't need to be present, Your Honor.

[PROSECUTOR]: No, Your Honor.

THE COURT: Thank you very much. Would you step back to the officer, sir. Thank you very much, Move out, please.

■ The exchange between Holmes and the court demonstrates that Holmes never raised an objection as to the particular instruction provided to the jury.[10] Indeed, when the court asked "... do you have any idea what you want to do," Holmes's counsel replied "[c]ontinue deliberating." Under *Patrick v. State*, 90 Md.App. 475, 481, 601 A.2d 1133 (1992), when a defendant fails to meet his or her "duty of stating distinctly at the time the specific grounds of objection" for a jury instruction, appellate consideration of such a claim will be forfeited.[11] At trial, Holmes had every opportunity to contend that the court's instruction was coercive or an unlawful deviation from MPJI–CR 2:01. Instead, Holmes failed to distinctly state any objection except to move for a mistrial. Accordingly, appellate consideration of Holmes's claim has been forfeited because it plainly appears by the record that it was neither raised nor decided by the trial court.

■ Assuming *arguendo* that Holmes's claim is preserved for appellate review, the trial court did not abuse its discretion in instructing the jury to continue its deliberations.[12] Under

10. As noted *supra*, the record demonstrates that Holmes moved for a mistrial because the jury was deadlocked, not because the trial judge had instructed the jury to continue deliberating.

11. Maryland Rule 4-325(e) provides that a claim relating to a court's instruction to the jury will not be preserved for appellate review unless a party "stat[es] distinctly the matter to which the party objects and the grounds for the objection." Similarly, an "appellate court will not decide any ... issue unless it plainly appears by the record to have been raised in or decided by the trial court ...". Md. Rule 8-131(a).

12. On appeal, Holmes takes issue with the language used by the trial court in its response to the jury, not that the trial court erred in its decision to instruct the jury to continue its deliberations.

the circumstances, the manner in which the trial court used to communicate its instruction to the jury was appropriate.

Holmes relies on *Ruffin v. State*, 394 Md. 355, 359 n. 2, 906 A.2d 360 (2006) to support his contention that trial courts must issue MPJI–CR 2:01 "without deviation." [13] Holmes argues that "[i]n addition to being drastically shortened, the trial court's instruction contained none of the pattern instruction's emphasis on 'individual judgment,' or on holdouts' adherence to their 'honest belief[s].' " As a result, Holmes claims that the trial court erred in failing to issue the model instruction. We disagree.

■■■ It is well settled that "[t]he decision of whether to give supplemental instructions is within the sound discretion of the trial judge and will not be disturbed on appeal absent a clear abuse of discretion." *Sidbury v. State*, 414 Md. 180, 186, 994 A.2d 948 (2010) (citing *Roary v. State*, 385 Md. 217, 237, 867 A.2d 1095 (2005)); *Lovell v. State*, 347 Md. 623, 657, 702 A.2d 261 (1997) ("Whether to give a jury supplemental instructions in a criminal case is within the discretion of the trial judge."). Additionally, the determination to have a jury continue deliberating or to declare a mistrial is a matter largely within a trial judge's discretion. *Graham v. State*, 325 Md. 398, 412, 601 A.2d 131 (1992); *Mayfield v. State*, 302 Md. 624, 631, 490 A.2d 687 (1985). This particular discretion has been deemed "broad," and a "trial judge's decision [whether or not] to declare a mistrial when he considers the jury deadlocked is

---

**13.** MPJI–CR 2:01 provides that:

The verdict must be the considered judgment of each of you. In order to reach a verdict, all of you must agree. In other words, your verdict must be unanimous. You must consult with one another and deliberate with a view to reaching an agreement, if you can do so without violence to your individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. During deliberations, do not hesitate to reexamine your own views. You should change your opinion if convinced you are wrong, but do not surrender your honest belief as to the weight or effect of the evidence only because of the opinion of your fellow jurors or for the mere purpose of reaching a verdict.

therefore accorded great deference by a reviewing court." *Id.* (internal quotations omitted).

In *Ruffin, supra,* the appellant argued that the jury instruction given by the trial judge violated his procedural rights because key portions of MPJI–CR 2:02,[14] necessary for the jury to understand its duties, were omitted. In particular, the appellant argued that the "additions and omissions of the trial judge in his instruction to the jury on the presumption of innocence and reasonable doubt lowered the burden of proof necessary to convict him." *Ruffin, supra,* 394 Md. at 362, 906 A.2d 360. The Court of Appeals held that, "as a matter of non-constitutional Maryland criminal law, in every criminal jury trial, the trial court shall instruct the jury utilizing the Maryland Criminal Pattern Jury Instruction on the presumption of innocence and proof beyond a reasonable doubt, MPJI–CR 2:02." *Ruffin, supra,* 394 Md. at 364, 906 A.2d 360. As a result, the Court reversed the appellant's convictions in *Ruffin* and remanded the case to the circuit court for a new trial. Nevertheless, *Ruffin* is distinguishable from the case *sub judice.*

First, the issues in this case do not implicate MPJI–CR 2:02, and, therefore, do not trigger an analysis under *Ruffin, supra.* Further, the trial judge's instruction did not include

---

**14.** MPJI–CR 2:02 provides that:

The defendant is presumed to be innocent of the charges. This presumption remains throughout every stage of the trial and is not overcome unless you are convinced beyond a reasonable doubt that the defendant is guilty.

The State has the burden of proving the guilt of the defendant beyond a reasonable doubt. This burden remains on the State throughout the trial. The defendant is not required to prove [his][her] innocence. However, the State is not required to prove guilt beyond all possible doubt or to a mathematical certainty. Nor is the State required to negate every conceivable circumstance of innocence.

A reasonable doubt is a doubt founded upon reason. Proof beyond a reasonable doubt requires such proof as would convince you of the truth of a fact to the extent that you would be willing to act upon such belief without reservation in an important matter in your own business or personal affairs. If you are not satisfied of the defendant's guilt to that extent, then reasonable doubt exists and the defendant must be found not guilty.

any additional language to suggest unlawful deviation, as was the case in *Ruffin, supra.* Furthermore, Holmes has not provided this Court with any authority to suggest that such a simple and abbreviated response is improperly coercive. In particular, Holmes relies on *Stewart v. State,* 334 Md. 213, 229, 638 A.2d 754 (1994). In *Stewart,* the Court of Appeals held that the trial court's instruction to a juror of "go back and continue deliberating and exercise [your] best judgment as to how [your] duty should be discharged" was "woefully inadequate" and "in no way met the requisites of the instruction [the Court of Appeals] indicated would be proper to give a jury having difficulty reaching a verdict." *Id.* at 229–30, 638 A.2d 754. The supplemental instruction in *Stewart* was improper because the Court determined that the trial judge's motive was to obtain unanimous verdicts of the jury on the offenses charged. *Id.* The Court further determined that Stewart was prejudiced by the judge's errors. *Id.* Critically, Stewart was denied the chance to evaluate the "judge's solution to the problem and make such objection and suggestions as he deemed to be advisable." *Id.*

We recognize that judges must be careful that their responses to jury questions are not coercive. *See Butler v. State,* 392 Md. 169, 178, 896 A.2d 359 (2006). Here, the record is devoid of any indication that the trial judge's motive was to ensure a unanimous verdict or was otherwise improper. The abbreviated instruction in this case did not charge the juror to defer to the majority or communicate to the jury that nothing short of a unanimous verdict would be accepted. *See, e.g., Goodmuth v. State,* 302 Md. 613, 618, 490 A.2d 682 (1985) (finding error in language suggesting that jurors should give "proper regard and deference" to the opinions of a majority); *Goldsberry v. State,* 182 Md.App. 394, 416, 957 A.2d 1110 (2008) (finding error in instruction that "anything short of a unanimous verdict is not acceptable"). Indeed, the trial court's limited instruction made it clear that the jury was to simply continue its deliberations. Unlike in *Stewart,* Holmes was afforded the opportunity to evaluate the "judge's solution to the problem." Holmes and the court shared an exchange

concerning the specific jury instruction, which resulted in an agreement that the court would simply instruct the jury to "[c]ontinue deliberating." Accordingly, this case is distinguishable from *Stewart* because the trial court's instruction did not present any potential for coercion. Therefore, the trial court did not abuse its discretion in responding to the note from the jury.

## III.

■■■ Holmes next contends that the trial court erred when it denied his motion for new trial in light of allegations that, while the jury was still deliberating, a juror saw Holmes, in shackles, being escorted by a correctional officer.[15] Holmes maintains that the juror's observation of Holmes violated his constitutional rights because it impaired his presumption of innocence. Under the circumstances, we disagree.

First, by failing to bring this claim to the trial court's attention prior to the jury's verdict, Holmes forfeited any ability to challenge the validity of the jury's verdict based on these circumstances on appeal. The record clearly demonstrates that Holmes and his counsel were aware of this encounter in advance of the jury's verdict, but did not raise this issue until after the verdict had been reached.[16] Upon the conclusion of the jury's deliberations, the following colloquy took place:

> THE COURT: Counsel, be aware is that we've had and received a communication from the jury. In fact we've received two communications from the jury. We had contacted you first because there was communication that

---

15. Holmes claims the trial court erred in denying his "motion for a mistrial," but defense counsel never requested a mistrial in connection with this claim. Holmes requested a "motion for new trial."

16. When defense counsel learned of this allegation from Holmes, she questioned one of the correctional officers who had escorted Holmes during the event in question as to whether a juror had seen him shackled. The correctional officer denied it. Defense counsel further inquired with the correctional officer's sergeant, and the sergeant, too, denied that the viewing had occurred.

they wanted some additional information, but at 12:55 the jury sent a message that says, "we've agreed upon a verdict for all charges."

*Is there anything the Defense wishes to place on the record at this time?*

[DEFENSE COUNSEL]: *No, Your Honor.*

THE COURT: Is there anything the State wishes to place on the record at this time?

[PROSECUTOR]: No, Your Honor.

THE COURT: Thank you very much. Mr. Clerk, if you would please bring the jury in.

(emphasis added). After the jury was brought in and it announced its verdict, the trial court asked defense counsel if she wished to have the jury polled. Defense counsel answered affirmatively. After the jury was polled, the verdict was hearkened and the clerk announced that the verdict had been rendered.

Prior to the trial court dismissing the jury, defense counsel asked to approach the bench. Thereafter, defense counsel shared with the court—for the first time—Holmes's account of his previous encounter with the juror, stating that Holmes believed that the foreman witnessed him shackled and escorted by a correctional officer. The trial court accommodated defense counsel's request to question the juror as to his observations, even though the "verdict [had] been taken." The following colloquy ensued:

THE COURT: ... Please approach. Would you step over here for me. Earlier were you in the hallway when he was in the hallway?

JUROR: Yes, I came out and knocked on the door.

THE COURT: When you had a question?

JUROR: A question, right.

THE COURT: And did you see him?

JUROR: Yes, and he was in the hallway.

THE COURT: And what was he doing?

JUROR: They was bringing him in.

**454**

THE COURT: And that was after you saw that? After you had the question?

JUROR: Right.

THE COURT: And that was the first question or the second question?

JUROR: Second question.

THE COURT: Okay. Now did that impact you in any way as to your verdict in this case?

JUROR: No.

THE COURT: Do you have any questions that you wish to pose?

[DEFENSE COUNSEL]: Did you see that he was in handcuffs?

JUROR: I really didn't notice.

THE COURT: Do you have any questions?

[PROSECUTOR]: No.

The trial court then dismissed the entire jury, including the foreman. At that point, defense counsel indicated her intention to file a motion for new trial. Defense counsel argued that Holmes was deprived of his right to a fair trial under the 14th Amendment of the U.S. Constitution. The trial court denied the motion.

■ In *Scott v. State*, 175 Md.App. 130, 146, 926 A.2d 792 (2007), we held that "[t]he failure of *voir dire* to disclose potentially disqualifying information does not, in all cases, entitle the defendant to a new trial." In particular, "[w]hen a defendant is aware that a prospective juror has failed to disclose information that is sought by *voir dire*, and fails to alert the trial court of the fact until after the verdict, he has waived the right to later complain." *Id.* This Court held that the trial court did not abuse its discretion in denying Scott's motion for new trial. *Id.* at 147, 926 A.2d 792.

Similarly, the record here reflects that Holmes and his counsel were aware of the encounter with the foreman, prior to the jury's verdict. Nevertheless, neither Holmes nor his counsel alerted the trial court to the circumstances of the

encounter, despite the trial judge's explicit invitation to raise any issues prior to the reading of the verdict. As a result, under the circumstances, Holmes forfeited any appellate review of this claim.

 Assuming *arguendo* that Holmes's claim is preserved for appellate review, the trial court did not abuse its discretion in denying Holmes's motion for new trial. The trial judge took appropriate measures by questioning the juror. In answering the trial judge's question, the juror stated that he did not notice whether Holmes was in handcuffs and that the encounter did not impact his verdict in the case. Accordingly, the record demonstrates that Holmes was not prejudiced.

As set forth above, after the verdict was returned, the trial court called the foreman of the jury to the bench for questioning. The foreman admitted that he had seen Holmes in the hallway with a correctional officer, but "didn't notice" whether Holmes was handcuffed. When questioned whether seeing Holmes in the hallway impacted his verdict in any way, the foreman's response was "[n]o." Holmes contends that the foreman's observation was "inherently prejudicial," and any finding of a lack of prejudice was faulty without a more in-depth scrutiny of the circumstances under which the observation took place.

Holmes's claim that the trial court should have probed the juror further, such as questioning whether he shared his observation with the other jurors, is misplaced.[17] Holmes was questioned by the trial court whether there was anything he

---

17. Although the trial court inquired into the juror's verdict by asking him questions, as well as permitting Holmes and the State to ask questions, which triggered Md. Rule 5-606(b)(1) protections, the trial court's level of inquiry was appropriate under the circumstances. Maryland Rule 5-606(b)(1) provides that:

In any inquiry into the validity of a verdict, a sworn juror may not testify as to (A) any matter or statement occurring during the course of the jury's deliberations, (B) the effect of anything upon that or any other sworn juror's mind or emotions as influencing the sworn juror to assent or dissent from the verdict, or (C) the sworn juror's mental processes in connection with the verdict.

wished to ask the foreman. Except for the one question regarding whether the foreman witnessed Holmes in handcuffs, Holmes did not inquire further into issues he now raises on appeal. As a result, Holmes not only failed to establish error, but he failed to create a record from which any perceived error could be determined. Under the circumstances, the trial court did not abuse its discretion in denying Holmes's motion for new trial.

## IV.

■■■ Holmes next contends that the trial court erred by failing to merge two of his convictions at sentencing. Holmes was sentenced to 15 years imprisonment for his conviction of use of a handgun in the commission of a crime of violence. CR § 4–204. Holmes was also sentenced to three years for his conviction of wearing, carrying, or transporting a handgun. CR § 4–203(a)(1)(I).

It is well settled that when convictions for use of a handgun in the commission of a crime of violence, and wearing, carrying, or transporting a handgun are based upon the same acts, separate sentences for those convictions will not stand. *Wilkins v. State*, 343 Md. 444, 446–47, 682 A.2d 247 (1996); *Hunt v. State*, 312 Md. 494, 510, 540 A.2d 1125 (1988). Accordingly, the State concedes that Holmes's sentences for these two convictions must be merged under the rule of lenity. *Hunt*, 312 Md. at 510, 540 A.2d 1125. Applying the relevant merger principles to this case, we merge Holmes's three-year sentence for wearing, carrying, or transporting a handgun into his 15–year sentence for use of a handgun in the commission of a crime of violence. *See, e.g., Abeokuto v. State*, 391 Md. 289, 356, 893 A.2d 1018 (2006) ("Where there is a merger under the rule of lenity, the offense carrying the lesser maximum penalty ordinarily merges into the offense carrying the greater maximum penalty." (internal citations and quotations omitted)) (citing *Dixon v. State*, 364 Md. 209, 238, 772 A.2d 283 (2001)). Although we merge the two convictions for purposes of sentencing, we do not remand because the trial court sentenced Holmes concurrently on these two offenses.

## V.

Holmes's final contention is that the trial court erred because Holmes's sentences were based on impermissible considerations. Specifically, Holmes maintains that: (1) "the trial court appeared to punish Mr. Holmes for invoking his right to trial"; and (2) "the trial court appeared to base its sentencing decision on personal ill-will and extra-judicial considerations." We disagree.

Trial judges are vested with broad discretion in sentencing. *Jackson v. State*, 364 Md. 192, 199, 772 A.2d 273 (2001) (citing *Poe v. State*, 341 Md. 523, 531, 671 A.2d 501 (1996); *Jennings v. State*, 339 Md. 675, 683, 664 A.2d 903 (1995)). In exercising this discretion, the sentencing judge should consider "the facts and circumstances of the crime committed and the background of the defendant, including his or her reputation, prior offenses, health, habits, mental and moral propensities, and social background." *Jackson*, 364 Md. at 199, 772 A.2d 273 (quoting *Poe*, 341 Md. at 532, 671 A.2d 501). The judge's consideration should be undertaken with the aim of furthering the goals of the criminal justice system: punishment, deterrence, and rehabilitation. *Jackson*, 364 Md. at 199, 772 A.2d 273.

A sentence is subject to appellate review on three bases: (1) whether it is in violation of federal or state constitutional protections; (2) whether the sentencing judge was motivated by ill-will, prejudice, or other impermissible considerations; and (3) whether the sentence is within statutory limits. *Id.* at 200, 772 A.2d 273 (citing *Gary v. State*, 341 Md. 513, 516, 671 A.2d 495 (1996)). In the instant case, the record demonstrates that the sentence imposed by the trial court was not based on any impermissible considerations.

Holmes's first claim that "the trial court appeared to punish Mr. Holmes for invoking his right to trial" is misplaced. "It is absolutely clear that a trial court may not punish a defendant for invoking his right to plead not guilty and putting the State to its burden of proof for protesting his

innocence." *Jennings, supra,* 339 Md. at 684, 664 A.2d 903 (citing *Johnson v. State,* 274 Md. 536, 542–43, 336 A.2d 113 (1975)); *see Bordenkircher v. Hayes,* 434 U.S. 357, 363, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978) ("to punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort"). The trial court's comments which Holmes relies upon are taken wholly out of context. Further, Holmes ignores the trial court's affirmative disavowal of any impermissible considerations.

Holmes's contention, in part, originates from pre-trial discussions regarding the possibility of Holmes accepting a plea agreement offered by the State.[18] When Holmes and the State appeared for a motions hearing on September 1, 2011, defense counsel indicated to the court that although Holmes had previously expressed interest in accepting the State's plea offer, Holmes "now has decided that he is not going to accept the State's offer." The following colloquy took place:

> THE COURT: It's all right with me. It's not doing me any harm. I'm not angry with him. It's just that he's taking off the table—what's the charges in this case?
>
> [PROSECUTOR]: Attempted first degree murder.
>
> THE COURT: Oh, okay. And he's no longer interested in—what was the offer?
>
> [PROSECUTOR]: The offer was five years to the count of second degree assault and a concurrent five years to a misdemeanor in possession of a firearm.
>
> THE COURT: With parole?
>
> [PROSECUTOR]: Yes.
>
> THE COURT: Oh, it's all right with me that he gives that up because it's not going to come back again. It wasn't offered by me so feel free to turn it down.

---

**18.** The State informed Holmes that if he agreed to plead guilty to second-degree assault and misdemeanor possession of a firearm, the State would agree to present to the trial court, for its consideration, a plea agreement in which the trial court would be asked to impose a sentence of two concurrent five-year sentences. The State also agreed to recommend parole as ordinarily provided by law.

Holmes claims that these statements were "impermissible" because they "indicated that [the trial court's sentencing] disposition was based at least in part on Mr. Holmes putting the state to its burden of proof." Indeed, the trial court's statements had nothing to do with Holmes's post-verdict sentence. The court's comments were made solely within the context of the plea agreement offered by the State—and not the court—that Holmes was considering, but ultimately rejected. It is clear from the record that the language the court used was for the purpose of ensuring that Holmes understood what he was rejecting. The trial court exercised its discretion by allowing Holmes additional time to consider the plea agreement offered by the State. Accordingly, the trial court's pre-trial comments do not constitute impermissible considerations, but rather the appropriate exercise of discretion in the management of pre-trial proceedings.

Holmes further maintains that the trial court entertained impermissible considerations because "the trial court determined, *before trial*, that [it] would impose a sentence above the guidelines minimum if Mr. Holmes maintained his right to trial and was ultimately found guilty." The precise language used by the trial judge is as follows:

> THE COURT: If you're [sic] client doesn't want to deal that's all right with me. I don't want him to feel obligated. Because if they come up with one of these other counts it's not going to be five years.

Critically, the plea agreement that Holmes rejected would have required him to plead guilty to second-degree assault and misdemeanor possession of a firearm. The trial court's statement simply acknowledged that if Holmes was later convicted of other offenses for which he was charged, the trial court would be required, by law, to impose a sentence greater than that contemplated by the plea agreement. In particular, if Holmes was convicted of attempted first or second-degree murder, the trial court would have been obligated to treat that conviction more seriously, for sentencing purposes, than a conviction for second-degree assault and misdemeanor possession of a firearm.

Further, the trial court affirmatively disavowed any consideration of pre-trial discussions or negotiations in its formulation of Holmes's ultimate sentence. During sentencing, the following colloquy ensued:

[DEFENSE COUNSEL]: Your Honor, I would just say that because of these discrepancies in the guidelines as well as Mr. Holmes did rely in negotiations before trial began—

THE COURT: Well, I don't talk about negotiations, but I'll talk about anything else except the word negotiations.

[DEFENSE COUNSEL]: Okay, when there were plea discussions before the case began and after motions—

THE COURT: Isn't that the same as negotiations, plea discussions? You want to talk about the guidelines?

[DEFENSE COUNSEL]: Yes.

THE COURT: You can talk about the guidelines.

Indeed, defense counsel attempted to continually reference matters relating to pre-trial discussions. Nevertheless, the court made itself abundantly clear that:

THE COURT: Whatever was discussed before trial is of no import to this court.

[DEFENSE COUNSEL]: Well,—but Mr. Holmes could have if he knew that the guidelines were—

THE COURT: If Mr. Holmes could have, should have, might have is of no import for this court. Mr. Holmes elected a trial, elected a jury, had a trial by jury. A jury who failed to find him guilty of attempted murder in the first and attempted murder in the second.

The record demonstrates that the trial court's sentencing decision was not based on any consideration of anything that occurred pre-trial. The record reflects nothing more than the trial court's view of the appropriate sentence based on a host of factors including Holmes's post-verdict refusal to accept responsibility or express remorse for his crimes.[19] Upon a

---

19. The Court of Appeals has held that where a defendant refuses to express remorse or accept responsibility for his or her crimes after the

finding of guilt on some of the charges, the trial court ordered that a pre-sentence investigation be completed. At sentencing, the trial court referenced Holmes's "disdain for the law." This reference by the trial court was not related to Holmes's failure to plead guilty, but rather related to the circumstances of this case and Holmes's prior interactions with the criminal justice system. Therefore, Holmes's claim that "the trial court appeared to punish Mr. Holmes for invoking his right to trial" is completely unfounded. Accordingly, the trial judge's comments at sentencing were an appropriate exercise of the trial court's discretion in sentencing Holmes.

Holmes's second claim that "the trial court appeared to base its sentencing decision on personal ill-will and extra-judicial considerations" is misguided. Holmes claims that "[i]n addition to embodying conspicuous animosity, the trial court's remarks indicate that the sentencing decision was based on a special concern for a neighborhood where the trial judge and his family have lived and traveled and attended church." Indeed, the trial judge discussed personal facts about himself and how his personal background *could* affect his sentencing decision. Nevertheless, a review of the record reveals that although the trial judge referenced his familiarity with the geographic area in which the offenses occurred, the trial judge's comment was designed to explain to the parties that he was explicitly restraining himself from using that information as a factor in sentencing Holmes. The following colloquy took place after hearing from both Holmes and the State:

> THE COURT: Upon review of the facts and circumstances of this case as well as your record is that the court is really tempted to bang you as far as it could bang you and

---

jury's verdict has been rendered, that lack of remorse and failure to accept responsibility may be considered in the formulation of an appropriate sentence. *See, e.g., Jennings, supra,* 339 Md. at 688, 664 A.2d 903 ("We hold that a sentencing court may consider, on the issue of the defendant's prospects for rehabilitation, the defendant's lack of remorse.").

that is to make [each of the sentences] consecutive to each other.

* * *

My calculation is 15 plus 15 plus three plus five plus one is 39 years.

* * *

I'm really tempted to let you know is that I don't want you anywhere near Baltimore City. I'm clearly at this point that you should know is that as my family across Martin Luther King Boulevard, as my family comes up Saratoga Street, three blocks from where I grew up and when [sic] to church, where my aunt and uncle who raised me when my family couldn't, that I recognize where you came from and I don't think you belong there.

* * *

That's the temptation that this court is fighting this morning.

Nevertheless, rather than—as the trial court put it—"bang [Holmes] as far as it could bang [him]," the trial court exercised restraint and rendered all of Holmes's sentences to run concurrently, with the exception of his mandatory sentence for possession of a regulated firearm after having been convicted of a disqualifying crime.[20] Furthermore, it was appropriate for the judge to convey to Holmes the impact of his conduct on the community. That communication was certainly well within the court's discretion. Instead of using his personal background and calculation of 39 years to impose a higher sentence, the trial judge consciously disregarded that temptation and sentenced Holmes to 20 years. Accordingly, the trial court did not err in sentencing Holmes.

 Assuming *arguendo* that the trial judge considered his personal background in sentencing Holmes, doing so would

---

**20.** Assuming the trial court was motivated by "ill-will" and "extra-judicial" considerations, the trial court could have sentenced Holmes (consistent with the State's recommendation) to a total of 54 years, with the first five years without parole.

not have been grounds for error. In *Jennings, supra,* 339 Md. at 685, 664 A.2d 903, the Court of Appeals noted that "permitting the trial court to base its sentence on perceptions . . . such as other sources as . . . any personal knowledge the judge may have gained from living in the same community is perfectly acceptable." (internal quotations omitted). The trial court's comments, viewed in the context with which the court intended, merely reflect the trial judge's personal knowledge of the community, its historical struggles with criminal activity, and efforts made to improve the neighborhood. As a result, the trial judge's mention of his personal background was intended only to impart knowledge to Holmes that his actions on the community were destructive. Accordingly, assuming *arguendo* that the sentence was based on the factors articulated by the court, the sentence would not have been based on impermissible considerations.

For the reasons set forth above, we affirm the judgments of the Circuit Court for Baltimore City. We, however, merge Holmes's sentence for wearing, carrying, or transporting a handgun into Holmes's sentence for using a handgun in the commission of a crime of violence.

**JUDGMENTS OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED. APPELLANT'S SENTENCE FOR WEARING, CARRYING, OR TRANSPORTING A HANDGUN IS MERGED INTO THE SENTENCE IMPOSED FOR USING A HANDGUN IN THE COMMISSION OF A CRIME OF VIOLENCE. COSTS TO BE PAID BY APPELLANT.**